**Harold DeLESSTINE, Plaintiff-Appellee,**

v.

**FORT WAYNE STATE HOSPITAL AND TRAINING CENTER, et al.,**
**Defendants-Appellants.**

**No. 80–2102.**

United States Court of Appeals,
Seventh Circuit.

Submitted April 26, 1982.*

Decided June 24, 1982.

Certiorari Denied Nov. 15, 1982.
See 103 S.Ct. 378.

---

* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Rule 34(a); Fed.R.App.P., Circuit Rule 14(f). Appellants have filed such a statement and requested oral argument. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record.

Theodore L. Sendak, Atty. Gen. of Indiana, Indianapolis, Ind., for defendants-appellants.

Kirby G. Moss, Fort Wayne, Ind., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

CUMMINGS, Chief Judge.

This is a review of the district court's finding that defendants-appellants have unlawfully terminated plaintiff's employment as a Dietician III at the Fort Wayne State Hospital and Training Center (State Hospital), because of his race in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

## I

We proceed by addressing appellants' argument which is tantamount to an assertion of an affirmative defense, namely that in order to establish an element of a prima facie case of employment discrimination, the plaintiff is required to prove that his position was not filled by "a member of the protected minority."

In *McDonnell Douglas Corp. v. Green*, the Supreme Court held that a plaintiff could make a prima facie claim of employment discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted). Appellants argue that appellee has not and cannot establish a prima facie case of discriminatory discharge from employment because "element (iv) [of the *McDonnell* model for proving a prima facie case] necessitates a showing that a plaintiff's position was filled by a person not a member of the protected minority. . . . [And since] the evidence established that [appellee, a black man] was permanently replaced by a member of a protected class [a female], the burden of going forward did not pass to Appellants." [1] [Appellants' *Brief* at 6–7]. The dissenting opinion, in support of appellants' argument, also sees the fact that appellants sought minority applicants as foreclosing the finding that appellants have engaged in discriminatory conduct towards this appellee.[2]

 That reasoning would foreclose a plaintiff from proving a prima facie case unless an employer discriminated not only against plaintiff but also against every so-called protected minority by hiring a so-called "non-protected" person to fill the position.[3] Appellants' argument defies the logic, purpose and language of Title VII.

---

**1.** Appellant cites *Markey v. Tenneco Oil Co.*, 439 F.Supp. 219, 223 (D.C.La., 1977) *aff'd* in part and *rev'd* in part, 635 F.2d 497 (5th Cir. 1981). However, it appears that appellant is relying on the holding at 224 where the court stated: "It is questionable in this case whether Markey has even gone so far as to present a prima facie case of discrimination. A plaintiff's mere suspicion that he has been discriminated against, is not sufficient evidence to support an individual charge under Title VII. *Markey did not demonstrate that the position he vacated was filled by a white person. In fact, Paul Floth testified that Markey had been replaced by a black.*" (footnote omitted) (emphasis added)

As will be clear from our analysis, we disagree with the language of the *Markey* court that appears to require for proof of a prima facie case of a Title VII discrimination that the person discharged be replaced by a "non-minority."

**2.** "The ultimate fact is that State authorities are branded as having engaged in discriminatory conduct in violation of a federal statute, notwithstanding, as the majority opinion observed, 'the appellants did in fact seek minority applicants.'" *Infra* at 138 (Pell, J., *dissenting*).

**3.** Establishment of a prima facie case under the *McDonnell* model "creates a presumption [a legally mandatory inference] that the employer unlawfully discriminated against the employee". *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–255, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). It does not constitute an ultimate finding of fact as to discriminatory discharge from employment under Title VII. *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1981). "The ultimate burden of persuading the trier of fact that the defendant unintentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. After a plaintiff proves, by a preponderance of the evidence, a prima facie case of discriminatory discharge or failure to hire, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employer's rejection [or employee's discharge]." *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824. If such reason is articulated by the employer, the focus returns to the plaintiff so that he can be afforded a fair opportunity to show that [the employer's] stated reason for [the employee's] rejection [or discharge] was in fact pretext." *Id.* at

The reference to an employer seeking applicants from persons of "complainant's qualifications" in the (iv) element of the *McDonnell* model for establishment of a prima facie case, does not refer to the complainant's racial, ethnic, gender, religious, or national origin background. Title VII does not establish a class of protected minorities and non-protected others. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 259, 101 S.Ct. at 1097. "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Const. Corp. v. Waters*, 438 U.S. at 579, 98 S.Ct. at 2951. We hold that the reference to "complainant's qualifications" in the *McDonnell* model refers to a complainant's pertinent skills, talents, learning, training, and experience. The central focus of the inquiry in a Title VII case such as this is whether the employer is treating a plaintiff less favorably than others because of his race, color, religion, sex or national origin. *Id.* at 577, 98 S.Ct. at 2949. "[T]he Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.... Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.... Congress has not commanded that the less qualified be preferred over the better qualified simply be-

cause of minority origin. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 431, 432, 436, 91 S.Ct. 849, 853, 854, 856, 28 L.Ed.2d 158 (1971).

The fact that appellants have hired a female to replace appellee does not therefore preclude appellee from proving a prima facie case of discriminatory discharge from employment. "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.... 'The company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it.'" *Furnco Const. Corp. v. Waters*, 438 U.S. at 579, 98 S.Ct. at 2950–51, *citing, Teamsters v. United States*, 431 U.S. 324, 341–342, 97 S.Ct. 1843, 1857–58, 52 L.Ed.2d 396 (1977).[4]

## II

We will now apply the clearly erroneous standard to the review of the district court's findings of subsidiary facts encompassing the parties' conduct. *Fed.R.Civ.P. 52(a)*. However, the ultimate fact of discrimination, namely whether defendants' conduct constitutes a violation of Title VII, involves both a finding of fact and a conclusion of law. Consequently, we may make an independent examination of the ultimate fact of discrimination, though we are still bound by findings of subsidiary facts which are not clearly erroneous. *Stewart v. General Motors Corp.*, 542 F.2d 445, 449 (7th Cir. 1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977).

804, 93 S.Ct. at 1825; *Davis v. Weidner*, 596 F.2d 726, 729 (7th Cir. 1979).

4. Even assuming *arguendo* that appellants' interpretation of the (iv) element in *McDonnell* was correct, their argument is nonsensical. The facts in the instant case clearly show that appellants did in fact seek "minority" appli-

cants. Therefore even if as appellants contend, "complainant's qualifications" in *McDonnell* refers to a complainant's "minority" status, which, as we made clear, it does not, plaintiff has satisfied the requirement of showing that the employer sought applicants of complainant's qualification.

■ Plaintiff-appellee established a prima facie case of employment discrimination by proving that: he is a black man who was qualified for his position as chief dietician at the State Hospital having been trained in dietetics, receiving a bachelor of science degree from New York University and a master of science degree from Columbia University;[5] despite his satisfactory work performance he was discharged from his position;[6] and the position was filled temporarily by an individual who appellants admit was not qualified for the job, and later the position was filled by an individual of complainant's qualifications. *See Davis v. Weidner*, 596 F.2d at 730.

■ Defendants-appellants then met their burden of rebutting appellee's prima facie case,[7] by articulating a legitimate, nondiscriminatory reason for appellee's discharge.[8] Appellants' only articulated reason was that appellee was discharged for "Conduct Unbecoming a State Employee, in that while [he was] *claiming to be ill* after surgery *and unable to perform [his] duties* as a Dietician III for the State of Indiana and this Training Center, [he] worked as a consulting dietician for the Glen Oaks Nursing Home in Auburn, Indiana on the following dates [five specified dates]." (Plaintiff's *Exhibit* 1—State Hospital's official notice of suspension pending dismissal) (emphasis added). The record is devoid of any facts in support of the dissent's view that

appellants' articulated reason was based on a claim of a state policy forbidding an employee from engaging in any other kind of employment while on sick leave. The dissent ignores that appellants' articulated reason merely sought to utilize appellee's performance of consulting work as proof of the lack of truth and veracity in appellee's claim to be ill and unable to perform his duties at the State Hospital. (*Transcript* at 119–20, 131).

■ Direct showing of the discriminatory reasons that more likely motivated an employer in the decision to discharge an employee is not the only method of proving intentional discrimination. Intentional discrimination may also be proven "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas v. Green*, 411 U.S. at 806–807, 93 S.Ct. at 1826–27. We hold that the evidence establishes that the appellee proved that appellants' proffered reason was not the true reason for his discharge and that he was the victim of intentional discrimination. The primary facts proved at the trial were that while plaintiff was working at the State Hospital, before he went on sick leave, he was informed by a State Hospital social worker that there was a need at the Glen Oaks Nursing Home for a consulting dietician in order for the nurs-

5. The district court found that "[t]here was absolutely no evidence to indicate that plaintiff was not qualified for his position as chief dietician . . . ."

6. A showing of satisfactory performance is necessary to raise an inference of discrimination in a discharge from employment. Plaintiff met this requirement by showing that employer accepted his work without express reservation. *Flowers v. Crouch-Walker*, 552 F.2d 1277, 1281–1283 (7th Cir. 1977). Plaintiff contends that he experienced no problems in his employment until the defendant, Dr. Ackerman, was appointed as superintendent of the hospital. Upon said appointment, plaintiff contends he became a victim of a pattern of discrimination by the defendant; as an example, it is alleged that Dr. Ackerman had previously held a hearing without giving plaintiff notice or the right to have an attorney and demoted plaintiff, ap-

pointing a lesser qualified white person to plaintiff's job.

7. "The defendant[s] need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant[s'] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254–255, 101 S.Ct. at 1094–95 (citations omitted); *see* note 9, *infra*.

8. "A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of facts on the issue of whether the defendant's explanation is pretextual." *Id.* at 255 n.10, 101 S.Ct. at 1095 n.10; *see* note 2, *supra*.

ing home to meet medical standards. Because the State Hospital housed some forty patients at the nursing home, there was some concern that the home might be forced to close if medicare standards were not met and that the State Hospital would then be required to find alternative housing for the patients. Following the lead provided by the social worker at the State Hospital and pursuing the need recognized by the social worker, plaintiff agreed, prior to going on sick leave, to serve as a consultant to the nursing home. This was not shown to be contrary to law or State Hospital policy. On April 16, 1974, plaintiff began an extended period of sick leave. Dr. Reed notified the State Hospital that plaintiff would be entering Parkview Hospital, but that it was not possible at that time to determine how long plaintiff would be unable to work. On April 24, plaintiff underwent an especially complicated hemorrhoidectomy surgery. On June 7, Dr. Towles notified the State Hospital by letter that plaintiff would not be able to return to work until approximately July 8. On July 1, Dr. Towles again saw plaintiff and found that plaintiff was still having difficulty from the surgery. Dr. Towles so informed the State Hospital by a letter dated July 3, which also requested a leave of absence until July 29. Dr. Towles closed the letter by stating that "if additional information is needed please do not hesitate to call this office."

The facts further prove that when plaintiff discussed returning to his job at the State Hospital, Dr. Towles "objected violently," since plaintiff's post-surgery restrictions included sitting and lifting and plaintiff's duties at the State Hospital required a great deal of sitting and some occasional lifting. Most importantly, State Hospital policies required that a person returning from sick leave return with no restrictions. Thus, plaintiff was still unable to return to the State Hospital because he could not do so free of the restrictions placed on him by the attending surgeon. However, plaintiff's restrictions did not preclude him from engaging in part-time consulting work at the nursing home. His work there required neither sitting nor lifting. Further, plaintiff intended to make only approximately five consulting trips during the four-month period of his convalescence. Dr. Towles expressly approved plaintiff's limited number of consulting trips on the condition that plaintiff follow specified precautions, but he did not approve plaintiff's return to work at the State Hospital because of the difference in job requirements between the nursing home and State Hospital.

Dr. Ackerman, a doctor of education who is Superintendent of the State Hospital, learned of plaintiff's consulting work at the nursing home. Dr. Ackerman made a visit to the nursing home to see State Hospital patients and to personally investigate whether plaintiff was consulting there. However, Dr. Ackerman did not inquire as to the nature or extent of plaintiff's duties at the nursing home, nor did he inquire of plaintiff or of Dr. Towles as to plaintiff's duties or whether plaintiff had his doctor's permission to perform the consulting duties. The district court found that this latter course of conduct by Dr. Ackerman was in stark contrast to his personal investigation at the nursing home to verify that plaintiff had done some part-time consulting there.

Although Dr. Ackerman would not have allowed plaintiff to return to work until plaintiff could perform his full duties at the State Hospital, Dr. Ackerman determined that plaintiff's engaging in part-time consulting work while drawing sick pay from the State of Indiana constituted "conduct unbecoming a state employee," and terminated plaintiff's employment at the State Hospital, despite the fact that the part-time work was undertaken to meet the Hospital's need as recognized by its social worker. Dr. Ackerman did not discuss the termination with the plaintiff nor with Dr. Towles before suspending plaintiff effective July 16, pending termination as of August 15, even though Dr. Towles had invited such inquiry.

The following evidence was proved, establishing that defendants' proffered reason for discharging plaintiff was a pretext:

On July 11, Dr. Towles spoke to Dr. Sirlin, Medical Director of the State Hospital in 1974, and told Dr. Sirlin that he thought plaintiff would be able to return to work shortly and that Dr. Towles would communicate with Dr. Sirlin after again examining plaintiff. However, the decision to dismiss plaintiff was made on or before July 16, 1974, before Dr. Towles could report to Dr. Sirlin. Even though defendants were expecting a further report from plaintiff's surgeon, plaintiff was suspended pending dismissal before that report could be sent. The action was taken prior to any investigation of whether plaintiff had the consent of his surgeon to continue doing permissible part-time work at the nursing home, work he had agreed to do, upon arrangement by the Hospital's social worker, prior to his sick leave, and the decision to suspend plaintiff was taken prior to any investigation as to whether the nature of plaintiff's work at the nursing home differed significantly from the nature of his work at the State Hospital. After plaintiff's suspension and pending dismissal, Dr. Sirlin received a strongly worded letter from Dr. Towles, dated July 19, protesting plaintiff's dismissal and expressing surprise and indignation at defendants' apparent disregard for his recommendations. Dr. Towles' letter discussed the post-surgical complications still being experienced by plaintiff and expressly stated that he had given plaintiff permission to make five or six trips to the Glen Oaks Nursing Home in Auburn, Indiana. Dr. Towles stated in the letter that "because he made these trips, did not qualify him for a return to his usual occupation, and this I shall maintain." Dr. Towles concluded his letter to Dr. Sirlin by stating that "I was very surprised at your course of action since I had talked with you,

given you his true state of affairs, and had informed you I would contact you after I had seen him. I must assume that you consider me either incompetent or lying, or both. Would be most happy to talk to you over the telephone or give you additional information by letter."

Only after receiving Dr. Towles' strongly worded letter did Dr. Sirlin call Dr. Towles on July 22. What the district court found as most probative of the fact that appellants' proffered reason was a pretext, was a memorandum prepared by Dr. Sirlin to Dr. Ackerman which purports to convey the July 22 conversation between Doctors Towles and Sirlin, but which in no way accurately reflects the conversation. Dr. Sirlin's memo stated that Dr. Towles "feels he has been misled by [appellee]". However, the district court found that Dr. Towles' July 19 letter to Dr. Sirlin and Dr. Towles' court testimony thoroughly discredit this conclusion, which was the superior's basis for appellants' articulated reason for discharging appellee. Appellants' records and the court testimony indicate appellants' fabrication of the facts and the utter disregard of information at their disposal relevant to appellee's conduct.[9]

In summary, the appellants' articulated reason of "conduct unbecoming a state employee" was a conclusory reason which might have been a legitimate reason for discharging the appellee if he had not been able to prove employer's intentional discrimination by showing that the articulated reason was a mere pretext.

### III

For the foregoing reasons, the district court's order [10] is affirmed.[11]

---

**9.** The dissent mischaracterizes these findings as the majority's "credibility determination", and proceeds to make its own findings as to credibility. However the credibility determinations were made by the district court in its province of judging the credibility of the evidence and determining the facts. Unlike the dissent, we do think it was proper for the district court to consider whether actions which have occurred subsequent to the appellants' determination to discharge the appellee were probative of the actual motives for appel-

lants' determination. On review we do not find the credibility determinations and the findings of fact clearly erroneous.

**10.** The district court held that "defendants did not meet their burden of establishing sufficient non-discriminatory reasons for terminating plaintiff's employment," but the court continued its analysis and held that "[i]t can only be concluded from the evidence in this case that

**11.** See note 11 on page 137.

PELL, Circuit Judge, dissenting.

In this case, the majority opinion upholds a judgment to the effect that the state authorities had discriminatorily discharged the plaintiff in violation of Title VII. This means in this case, in the words of the majority opinion, that the record established that the employer had treated the plaintiff less favorably than others because of his race. The plain and simple fact is that the plaintiff was engaging in part-time consulting work for pay while drawing sick pay from the public treasury and this was the reason Dr. Ackerman articulated for the discharge, i.e., that this was conduct unbecoming a state employee.

I can think of rio way of characterizing the being on the public payroll because of sick leave while not working but nevertheless performing compensated work in the private sector other than that of "unbecoming conduct." It takes no hyperactive imagination to realize what an embarrassing position the hiring authorities would have been placed in if this had come to the attention of the media. It appears to me that the appearance of unbecoming conduct on the part of a public employee is almost as damaging to the image of good government as would be the actual fact of misconduct.

I regard it as immaterial that the type of work at the nursing home may have been of a less demanding nature than the employment at the state hospital. The state may have had no policy against "moonlighting;"

I cannot tell from the record. It certainly, in any event, is an entirely different situation than the present one if a public employee has the capability of performing a second job and is being paid for both. Here he was not performing a second job but only a first job although being paid by the public while not working for it.

I fail to follow the logic of the majority opinion in its holding that the discharge was pretextual. The record is silent as to any discriminatory practices on the part of the appellants toward any employees because of race, color, religion, sex, or national origin. The finding of pretext dangles on the weak thread of the plaintiff's not being well enough to return to his state job and contradictory testimony as to what one doctor said to another. Apparently, the majority makes the credibility determination as to the accurate reflection of this conversation. Elsewhere, however, in the majority opinion it is clear that the memorandum from Dr. Sirlin to Dr. Ackerman was subsequent to the determination already made, and properly so, that the discharge was justified by conduct unbecoming to a state employee. I see nothing conclusory or pretextual about guarding the public coffers from unwarranted criticism.

In short, the majority's syllogism seems to be that plaintiff was a member of a protected minority class, that he was a competent employee with acceptable qualifications, that he was discharged because he was working on another job while on sick leave, *ergo*, the reason given for his dis-

---

defendants' stated reason for the termination of plaintiff's employment was pretext."

We hold that the district court's initial holding that defendants did not establish sufficient non-discriminatory reasons for terminating plaintiff's employment was non-reversible error. We believe that defendants met their burden of articulating a legitimate reason for plaintiff's discharge in that the articulated reason was sufficient to raise a genuine issue of fact as to whether defendants discriminated against the plaintiff, and it sufficiently met plaintiff's prima facie case, while framing the factual issue with sufficient clarity so that plaintiff was required to demonstrate pretext. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 255, 256, 101 S.Ct. at 1095. Nevertheless, the error is not grounds for reversal in this case, because our independent examination of

the ultimate fact of discrimination leads us to agree with the district court's finding that the plaintiff had met the burden of showing that defendant's articulated reason was a pretext.

11. Appellee seeks attorney's fees for the defense of this appeal. However appellee does not present any information to substantiate the request. Appellee is directed to file with the district court, within thirty days, a complete breakdown of the requested fees and such other material supporting the request, within the guidelines set forth in *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir. 1974), cert. denied, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). The district court shall determine the required procedure and issue an order disposing of the claim.

charge was pretextual. The process ignores the fact that there was a legitimate nondiscriminatory reason for the discharge. What Title VII is all about is to put a stop to discriminatory treatment of employees. The essential element of discrimination is missing here.

The plaintiff may well have been well qualified and when he was on the job he may have been an effective employee. The ultimate fact is that state authorities are branded as having engaged in discriminatory conduct in violation of a federal statute, notwithstanding, as the majority opinion observed, "the appellants did in fact seek 'minority' applicants."

This record does not justify that stigma. The appellants did what public officials properly should have under the circumstances here involved.

With all due respect to the majority opinion, and to the then district court judge, I would reverse with direction to enter judgment for the defendants. For the reasons stated above, I respectfully dissent.*

---

* I note the comments in the majority opinion regarding my dissent. Of course, the seeking of minority applicants will not preclude the existence of discriminatory treatment of a single individual. It is, however, a significant factor in a record which is devoid of evidence of racial discrimination. I do not regard a questionable finding that a post hoc exchange of correspondence really was only verisimilar on the part of Dr. Ackerman as a sufficient basis for saying that the discharge resulted from racial discrimination. An employer accused unjustly of discrimination unfortunately may tend to resort to unnecessary rationalization. This is an infirm basis for saying that there was indeed discrimination.