Doris **HUCK**, Plaintiff,

v.

**WHIRLPOOL CORPORATION,**
Defendant.

No. EV 79–203–C.

United States District Court,
S.D. Indiana,
Evansville Division.

Sept. 27, 1982.

Charles L. Berger, Evansville, Ind., for plaintiff.

Jeffrey R. Kinney, Evansville, Ind., Jeremy P. Sherman, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

BROOKS, District Judge.

This matter is before the Court upon Complaint of the Plaintiff, Doris Huck, filed with the Court on December 21, 1979, alleging that she has been unlawfully discharged from her employment with the Defendant, Whirlpool Corporation, on the basis of her sex. The parties have fully briefed the Court on the matters herein.

Plaintiff initiated her case through filing on February 16, 1978, a Complaint with the Equal Employment Opportunity Commission pursuant to 42 U.S.C. § 2000e, *et seq.* The plaintiff also filed a complaint on April 21, 1978 with the Evansville Human Relations Commission (hereinafter "EHRC") pursuant to Article III of the Municipal Code of the City of Evansville, Indiana of 1962, as amended. At all relevant times, the EHRC was a "state or local authority" duly designated under Section 706(c) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(c). The EHRC is designated to investigate, conciliate, conduct evidentiary proceedings and grant relief, where appropriate, pursuant to charges of unlawful employment discrimination, including gender discrimination. The EHRC investigated the alleged charge of gender discrimination and the Executive Director of the EHRC determined that a hearing should be held based upon plaintiff's charge. The parties were afforded discovery opportunities prior to the hearing.

A formal hearing on plaintiff's gender discrimination charge was held before the Evansville Human Relations Commission, on June 7th and 8th, 1979, in the City Building, Evansville, Indiana. Each party was represented by counsel and was given a full and fair opportunity to present evidence as well as to cross examine witnesses.

On July 25, 1979, the EHRC issued its Recommended Order and Decision which was adverse to the plaintiff. On October 16, 1979, the EEOC terminated its processing of plaintiff's charge and with it issued her a Notice of a Right to Sue.

The plaintiff filed the instant action with this Court on December 21, 1979. The Complaint was filed by the plaintiff within the proper time after receiving her Notice of a Right to Sue. Defendant filed a motion to dismiss on February 11, 1980 which was denied on June 3, 1981. The Court set the entire matter for hearing on June 26, 1981 after both parties stipulated to the use of the transcript of the prior EHRC hearing.

The plaintiff originally cited several causes for relief in her complaint, namely 42 U.S.C. § 2000e *et seq.,* the Civil Rights Act of 1871, 42 U.S.C. § 1983, as well as the Thirteenth and Fourteenth Amendments to the Constitution of the United States. During oral argument on June 26, 1981, plaintiff's counsel indicated that he was pursuing only the Title VII aspect of this case and not pursuing the claims of violations of 42 U.S.C. § 1983, or the Thirteenth and the Fourteenth Amendments. The issues involved in this matter concern only Title 42 of the U.S.C. § 2000e, and the case has progressed accordingly. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure the Court enters its Findings of Fact and Conclusions of Law in memorandum form.

## FACTUAL SUMMARY

Doris Huck was employed by Whirlpool on January 9, 1978 (Evansville Human Relations Commission Hearing Record of June 7th and 8th, 1979, hereinafter designated "H.R." at p. 21) as a probationary employee to work on one of the production lines. She, like all new employees, was to successfully work a standard forty-five (45) days probationary period (H.R. 49), after which she would acquire seniority rights. She was initially assigned the job of installing return bends into condensers (H.R. 22) under the supervision of Ken Winchester. Extra employees were working in this area (H.R. 23, 237). K. Winchester's initial impression of plaintiff's production performance was unsatisfactory. (H.R. 239). She received no verbal or written complaints at this juncture, however. (H.R. 22).

As an excess employee Mrs. Huck was assigned to an area of need when the position opened. (H.R. 307). On January 12, 1978, Mrs. Huck was assigned to leak testing coils on the hand solder line under the supervision of Kenny Gibson. (H.R. 22–23). The job consisted of placing valves on coil inlets and outlets and punching a button which caused the coil to be submerged in water for leak checks. (H.R. 24). Mrs. Huck had problems properly placing the valves securely on the coils for the water check tank. Supervisor Gibson informed Mrs. Huck that she was falling behind on this job and he subsequently removed her from leak testing upon her request (H.R. 24) before the end of her shift on January 12, 1978. She was reassigned on the hand solder line the following day to painting inlet tubes with a catalytic type paint and capping these tubes with rubber caps. (H.R. 24). A male probationer, Mr. Coomer, was switched from painting to the leak test job and performed adequately at each job. (H.R. 39, 238–9). In a couple of days, Mrs. Huck was also assigned the task of hammering "return bends" into the top of condensers at the beginning of the line. (H.R. 25). In the opinion of Supervisor Gibson, Mrs. Huck had problems with the painting job. Mr. Gibson informed Mrs. Huck on different occasions that she was (1) not keeping up · with a minimally acceptable rate of production and (2) not performing the painting task properly. (H.R. 243). Mrs. Huck continued the painting, capping and hammering tasks until she was released. (H.R. 26).

Mrs. Huck also had problems with bent fins on the condensers, which meant the unit had to be "recombed." Mrs. Huck did not feel she was responsible for the bent fins since she received units with that problem. (H.R. 27). Mrs. Huck did have to recomb fins on occasion and stack them on the skid. (H.R. 240). Various problems such as these existed prior to Mrs. Huck's employment, resulting in the line not keeping the proper production rate. (H.R. 26). Since the production rate was a continuing problem, Mrs. Huck felt she did not contrib-

ute to the existing problems and thus the reasons for her dismissal were pretexual.

## THE BURDEN OF PROOF

■ The plaintiff in a Title VII case possesses the ultimate burden of persuasion and the intermediate burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To prevail on a charge of gender discrimination in employment, a preponderance of plaintiff's evidence must demonstrate that the employer intended to discriminate against plaintiff on account of her sex. *Meier v. Evansville-Vanderburgh School Corp.*, 416 F.Supp. 748 (S.D.Ind. 1975); *aff'd* 539 F.2d 713 (7th Cir.1976); *Frockt v. Olin Corporation*, 344 F.Supp. 369 (S.D.Ind.1972).

■ Plaintiff chose to proceed under a disparate treatment theory [1] in which plaintiff's initial burden is to show actions "taken by the employer from which one can infer, if, such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act'." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978); *accord, International Board of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 and n. 13, 93 S.Ct. 1817, 1824 and n. 13, 36 L.Ed.2d 668 (1973). Disparate treatment occurs when an employer treats some individual less favorably than others based upon race, religion, sex or national origin. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, succinctly deline-

ates the criteria for a prima facie case of discrimination based upon a disparate treatment theory which can be made applicable to discharge cases as well as hiring cases. *See Texas Dep't of Community Affairs*, 450 U.S. at 253–254, nn. 6 and 7, 101 S.Ct. at 1093–1094, nn. 6 and 7; *Flowers v. Crouch-Walker*, 552 F.2d 1277, 1281 n. 3 (7th Cir. 1977); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892, 895 (8th Cir.1976), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). The plaintiff must prove differences in treatment and discriminatory motive.

■ Upon plaintiff establishing a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that plaintiff was rejected for a legitimate nondiscriminatory reason. Defendant must sufficiently justify the reasons for releasing the plaintiff thereby serving to (1) meet plaintiff's prima facie case by presenting legitimate reasons, and (2) provide a framework for plaintiff to have an opportunity to demonstrate pretext. If the defendant carried its burden, the plaintiff must demonstrate that the defendant's proffered reason was not the true reason for release and that the plaintiff was the victim of intentional discrimination. Plaintiff's ultimate burden of persuading the court may be accomplished through "either directly . . . persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *See McDonnell Douglas*, 411 U.S. at 804–805 [93 S.Ct. at 1825–1826]." *Texas Dep't of Community Affairs*, 450 U.S. at 256, 101 S.Ct. at 1095.

## THE PRIMA FACIE CASE

■ Plaintiff, Doris Huck, established a prima facie case of gender discrimination through establishing the following:

---

1. A prima facie case of discrimination under Title VII may be based upon other theories: (1) disparate impact; *see Griggs v. Duke Power Co.*, 401 U.S. 424, 429–33, 91 S.Ct. 849, 852–54, 28 L.Ed.2d 158 (1971), in which a facially neutral policy or practice operated to adversely affect a protected class. Under a disparate impact theory proof of discriminatory intent is not required whereas proof of discriminatory intent is required under a disparate treatment case. (2) Pattern or practice; *see International Board of Teamsters v. United States*, 431 U.S. 324, 358–60, 97 S.Ct. 1843, 1866–67, 52 L.Ed.2d 396 (1977), where the denial of rights is repeated, or of a generalized nature.

1. She is a member of a group protected by the Act.
2. The defendant sought employees and plaintiff qualified[2] for the job position for which she applied.
3. Plaintiff received a job but was discharged prior to completion of a probationary period.
4. After plaintiff's discharge, defendant continued to seek and hire applicants from persons of plaintiff's qualifications.[3] *See, McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

## REBUTTAL OF PRIMA FACIE CASE

Whirlpool Corporation's evidence focused primarily on Mrs. Huck's failure to improve her work performance. (H.R. 246). Supervisor Gibson stated that Mrs. Huck was terminated "because she was too slow and just unable to keep up with production." (H.R. 249). Mr. Gibson specified that she was deficient due to her continued inability to properly paint the condenser coils as manifested through numerous rejects. (H.R. 249). In addition, Mrs. Huck did not adequately assist hammering the "return bends" evidently due to inhibited performance caused by her chain smoking. (H.R. 280).

Whirlpool more fully explained that Mrs. Huck was initially assigned on January 9, 1978 to install return bends on condensers under the supervision of Ken Winchester, (H.R. 148). Like all probationary employees, she would receive no formal work orientation thus she would learn on the job. (H.R. 318). Winchester complained to Mitchell Carter, Whirlpool's Manpower Coordinator, that he could not find a job after her working two (2) days which she could adequately perform (H.R. 148) and the request was made to transfer her to Kenny Gibson who had lighter jobs. Carter cautioned Gibson to watch Mrs. Huck's performance. (H.R. 149).

Mr. Gibson assigned Mrs. Huck to the leak test operation on the assembly line and she received on the job training from one of the older employees. (H.R. 238). Mrs. Huck could not perform the work and she requested that she be moved. (H.R. 238). Gibson had her switch places on the line with a male probationary employee (H.R. 39, 238–9) who exhibited no difficulty with performance in either job. (H.R. 39, 239).

Mrs. Huck's new responsibility was painting and capping the coils. After a couple of days she also was assigned the task of assisting at the front of the line with hammering "return bends" into the top of condensers. (H.R. 25). This assistance task was recommended by the Industrial Engineer, Robert Wallenmeyer, to increase the production of the line based upon the time element study required to perform each job function on the line. (H.R. 185). Mr. Gibson discussed with Mrs. Huck on the second day she was on the new job that she was inadequately painting. (H.R. 257–58). Mr. Gibson had observed and pointed out to her that the problem appeared to be with her failure to allow the water to adequately drain. (H.R. 258). Mr. Gibson stated that approximately one-third (⅓) of plaintiff's production came back rejected due to improper painting and that rejection percentage on the line was higher than at any other time. (H.R. 256). Mr. Gibson also indicated that Mrs. Huck's productivity in assisting with hammering "return bends" at the front of the line was inadequate due, in great part, to her smoking. (H.R. 280).

Mr. Gibson worked with Mrs. Huck for approximately two weeks to get her to im-

---

**2.** The Seventh Circuit states that reference to "qualifications" in the McDonnell model "refers to a complainant's pertinent skills, talents, learning, training, and experience." *De Lesstine v. Ft. Wayne State Hospital,* 682 F.2d 130, 133, 29 F.E.P. 193, 195 (7th Cir.1982).

**3.** Establishment of a prima facie case creates a mandatory legal inference, but not an ultimate finding of discrimination with the primary fo-

cus being on whether a defendant treats "a plaintiff less favorably than others because of race, color, religion, sex or national origin." *De Lisstine* 682 F.2d at 133, 29 F.E.P. at 195. The *McDonnell* Court stated that comparable proofs will satisfy the initial burden in differing factual situations. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

prove her performance. As Michael Stagg, hand-solder line employee observed, Mr. Gibson spoke with Mrs. Huck "continuously" regarding problems with her production, painting the condensers and with working faster in order to assist with hammering "return bends." (H.R. 125–126, 276). Before taking action against the plaintiff, Mr. Gibson asked Manpower Coordinator Carter, previous foreperson on the line, to observe and assess plaintiff's work performance. (H.R. 153). Mr. Carter did so on January 30, 1978 (H.R. 245) and agreed with Mr. Gibson's prior assessment that she was not performing up to par. (H.R. 153). That same day, Mr. Carter and Mr. Gibson met with the plaintiff in the departmental office (H.R. 245) and warned Mrs. Huck that if she did not improve her painting or production she would be released. (H.R. 245). Mrs. Huck's performance did not improve after the warning and she was released after two days on February 1, 1978. (H.R. 246). Prior to taking this final action, Mr. Gibson consulted Mr. Carter and General Superintendent Oscar Pifer (H.R. 247) who concurred with Mr. Gibson's decision. (H.R. 153–54, 247).

## COMPARATIVE EVIDENCE

■ In a disparate treatment case comparative data must be examined. Whirlpool, in order to rebut plaintiff's prima facie case, must prove that others hired were somehow better qualified than plaintiff. *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977); *see Texas Dep't of Community Affairs,* 411 U.S. at 256, 101 S.Ct. at 1095; *Burdine v. Texas Dep't of Community Affairs,* 608 F.2d 563, 567 (5th Cir.1979); *East v. Romine, Inc.,* 518 F.2d 332, 339–340 (5th Cir.1975).

■ Various comparisons were presented throughout the evidence.

1. When Mrs. Huck could not perform the leak test, Supervisor Gibson had her switch places with a male probationary employee doing the painting on the line. (H.R. 39, 238). After the switch, the male probationary employee experienced no difficulty in performing the leak test. (H.R. 39–238).

2. Mrs. Huck's inability to adequately apply the catalytic type paint resulted in a high percentage of rejects. Upon cross examination, it was revealed that the rejection rate due to painting had never been as high as when plaintiff was on the job. (H.R. 256).

3. The testimony indicated that Mrs. Huck was the slowest employee on the line. (H.R. 153, 250).

4. Likewise during a two day absence by plaintiff, an unnamed male, who was a new employee (H.R. 163), satisfactorily performed (in an undefined manner) during plaintiff's brief absence. (H.R. 166–167).

5. After plaintiff was terminated, her position was taken by a "boy named Wayland" (H.R. 241) who was assigned the same work that plaintiff performed, including assisting at the front of the line (H.R. 241, contra 127) and combing fins. (H.R. 244). The hand solder line showed an increase in production after plaintiff left; however the line was shortly thereafter phased out. (H.R. 290–291).

Based upon this evidence, defendant Whirlpool sufficiently refutes plaintiff's prima facie case since dismissal was based upon job performance.

## ALLEGED PRETEXT

In order for plaintiff to carry her ultimate burden of persuasion she must demonstrate that Whirlpool's explanation that she was terminated due to inadequate painting and production performance is unworthy of credence, thus a pretextual explanation.

Mrs. Huck argues that she adequately performed her duties. She received no complaints regarding her first job (H.R. 22) from her supervisor, Ken Winchester, who later told Carl Askins, an oiler in the plant and local union trustee, that he did not have any problems with the plaintiff. (H.R. 65–68). Mrs. Huck did have problems with the leak test job and asked Mr. Gibson to move her. (H.R. 24). Upon being reassigned to painting coils, she worked for a couple of

days only to be given the additional task of assisting at the front of the line. (H.R. 25–26). Mrs. Huck also had to comb fins in order to remove dents and stack the parts on skids. (H.R. 28–30). These additional tasks required more time.

It is clear that Mrs. Huck had nothing to do with denting the fins. (H.R. 107). In fact, Mr. Gibson testified that Mrs. Huck had nothing to do with the denting. (H.R. 255). Mr. Gibson explained that a small proportion of Mrs. Huck's time was spent combing fins. (H.R. 256).

In comparison, sixteen (16) year employee Stagg testified that Mrs. Huck worked slower than he did and that Mr. Gibson asked him to help her. (H.R. 121). Mr. Stagg testified that he had to help the replacement for plaintiff "on occasion." (H.R. 127). The attitude of defendant, Whirlpool, and Supervisor Gibson in particular, is demonstrated by the fact that Mr. Gibson assigned Mrs. Huck to sweep while the line was down at least three (3) times during her employment (H.R. 28–29, 121–122) while employee Stagg noticed no one else being so assigned by Mr. Gibson during that time period. (H.R. 124). Mr. Stagg indicated that plaintiff's male replacement was not assigned to sweep the floor. (H.R. 127). Mr. Stagg also indicated that the plaintiff's male replacement did·not have to assist with the job of hammering "return bends" aside from painting. (H.R. 127).

Mrs. Huck argues that the production and quality problems asserted by Whirlpool for her dismissal were a mere pretext for her being Mr. Gibson's scapegoat to explain why the line had not and did not meet the Whirlpool Industrial Engineering Department's production estimate of seven hundred sixty three (763) units per shift. (Exhibit # 3). The only time that the line was to meet its rate was when Doris Huck was working, as Mr. Gibson explained on cross examination. (H.R. 274). The problem

with the production rate still existed after Mrs. Huck was replaced and the individual who replaced her was not dismissed. (H.R. 111–112). No data concerning the actual rate of the line before, during or after plaintiff's employment was presented. No figures were presented regarding the past rejection rates of coils due to painting as compared to when Mrs. Huck worked. Plaintiff's dismissal was based solely upon the observations of supervisors, and thus argues plaintiff, unworthy of credence. The line always had production problems and no evidence was produced that other individuals were dismissed due to the production rate. Repairing dented fins slowed production, however that was not factored into the production rate (H.R. 201) and Gibson testified he had never taken any disciplinary action against any employee for dented fins. (H.R. 255).

## PRETEXTUAL EVALUATION

The Court must evaluate these allegations of pretext. The initial supervisor of plaintiff, Ken Winchester, reported his evaluation to the Manpower Coordinator but said nothing to Mrs. Huck or employees concerning Mrs. Huck during the short time she was assigned to his area. Given this short time period, it does not appear unusual that the foreperson would only give a brief report to his supervisor.

· As a new employee Mrs. Huck was categorized as a "probationary" employee pursuant to the corporate Labor Contract. (Defendant's Exhibit 8). Leroy Bowel, Whirlpool's Labor Relations Administrator, described the position as "an employee who is on a probationary period to give the company a chance to see if this employee can adapt himself or herself to this type, refrigeration type work." (H.R. 304). Paragraph twenty-one (21) of the labor agreement sets forth the provision.[4] Bowel

4. ARTICLE VI
SENIORITY
21. Employees shall acquire seniority after forty-five (45) days from the date they start working, after which their seniority shall be as of the day they started to work.

21.1 Employees who are laid off before acquiring seniority shall maintain their service record unbroken for the purpose of acquiring seniority if they are reemployed within forty-five (45) days from the date of lay off.

also reported that probationary employees had been dismissed short of the forty-five (45) days period in the past; however it was not a common occurrence. (H.R. 304). The Court could not draw any inference from the fact that the dismissal took place prior to the probationary period elapsing. Certainly it is typical and a new employee ought to be aware that during the probationary period continuing evaluation takes place.

■ The fact that Mrs. Huck had not adequately performed the leak test and asked to be moved is not determinative of her ability to adequately work for Whirlpool. However, the painting and subsequent attendant tasks are indicative of a continuing problem. Supervisor Gibson concluded that Mrs. Huck was having production quality and rate problems as manifested through the rejection rate of coils. Employee Stagg corroborates the fact that stacks of coils were being rejected while Mrs. Huck was on the line. (H.R. 112). He states that redoing coils had been a continuing problem for twelve (12) years. (H.R. 112). This testimony requires the Court to, in essence, balance degrees of productivity in weighing any inference of discriminatory intent. It is an extremely difficult task where no records are kept of daily production or rejection rates. However, onerous record keeping ought not be required generally and Title VII does not mandate such requirements.

In weighing this evidence, the testimony indicates that Mrs. Huck was having problems painting adequately and that Mr. Gibson repeatedly gave her suggestions and discussed the problems with her. Mr. Stagg corroborated this fact and indicated he had been instructed by Mr. Gibson to help Mrs. Huck. Mr. Stagg had to help Mrs. Huck's male replacement only "on occasion." Mrs. Huck was a slow worker. Her immediate supervisor (Mr. Gibson) explained that she was the slowest worker while her co-em-

ployee (Mr. Stagg) explained that there was not a significant change with Mrs. Huck on the line, but concurred she was slow and indicated that management had worked with her. Despite instructions from co-workers and supervisory personnel, she was unable to improve her painting technique so that the rejection rate of condenser coils due to improper painting decreased. Her assistance hammering "return bends," though not deficient, did not bolster the line productivity. The problems with these job functions in conjunction with her admitted inability to perform elsewhere on the line, placed defendant Whirlpool in a position of having an employee whom they were unable to locate a job she could sufficiently perform in comparison to other employees similarly situated. There was no testimony that the male probationary employee or other comparable workers on the line had any of these limiting attributes that Mrs. Huck possessed.

■ The requirement of sweeping floors while the line was down is suspect to this Court. Mrs. Huck being singled out to perform a less desirable task could be totally inappropriate and indicative of a discriminatory intent. Mr. Gibson did testify that others were required to perform clean-up functions while Mrs. Huck worked. (H.R. 241–242). Mr. Stagg testified that it was "common procedure" for sweeping, as well as other cleaning functions, to take place while lines were down and that males as well as females were assigned to those cleaning tasks (H.R. 128) and had been assigned to sweep at other times. With this additional information, the Court is unable to conclude that sufficient discriminatory intent is present due to the assignment of occasional sweeping tasks.

Conflict exists as to the extent employees in Mrs. Huck's position of painting and occasionally combing fins had to assist at the front of the line with hammering "return bends". Mr. Wallenmeyer specifically rec-

---

21.2 Until an employee has acquired seniority, the Company shall be the sole judge as to whether such employee shall be continued in employment.

21.3 Such employee shall be governed by all other terms of this Agreement.

ommended to the supervisors, based upon his study, that the individual performing Mrs. Huck's job function ought to assist in hammering "return bends" in order to increase the production performance of the line. (H.R. 185). Mr. Wallenmeyer had not observed this practice, but stated that supervisors reported this practice to him prior to Mrs. Huck's commencing work. (H.R. 185). Mr. Gibson stated that Mrs. Huck's replacement, Mr. Wayland, did work at the front of the line (H.R. 241) while Mr. Stagg recalled that due to a job transfer and the addition of a new individual the practice was not necessary. (H.R. 127). The evidence indicates that Mrs. Huck was not singled out in assisting at the front of the line. The industrial engineering department had required this job sharing function for an on-going period of time in order to balance the time required to complete job functions and increase productivity. With the line being phased out shortly after Mrs. Huck's dismissal, the Court cannot conclude that the conflict in testimony regarding Mr. Wayland assisting at the front of the line is conclusive of any discriminatory treatment or intent on behalf of Whirlpool.

Mr. Carter explained that Mrs. Huck also had problems with productivity in general. Mr. Carter summarized the problem by stating:

> I think it has to do with attitude, more than anything. As I said, I have been a foreman for about twelve (12) to fifteen (15) years. Most new employees, when they come into a factory, they want to please. They put out their very best effort when they are new and Mrs. Huck did not. She would stand there. If she wasn't smoking, she wouldn't put forth the effort. (H.R. 167–168).

This concise statement indicates what the supervisory personnel had explained in detail throughout the testimony. Various problems exhibited by Mrs. Huck set her apart from the other employees as a poor worker. The Whirlpool personnel were going through evaluative steps typical for a probationary period.

The testimony did indicate however that Mr. Gibson watched the employees closely. As employee Ralph Blake put it, Gibson "bird-dogged" the employees (H.R. 94–95), but he noted no difference in Gibson's treatment between men and women. (H.R. 98–99). Mr. Gibson may have been a demanding supervisor or may have watched his employees carefully. Personality conflicts may have existed between supervisor and employee due to the continuing talks on the line or assignments to sweep, but these incidents by themselves, do not rise to the level of illegal gender discrimination. *See Hill v. BASF Wyandotte Corp.*, 27 F.E.P. 66, 72 (E.D.Mich.1981) (black female employee claim of sexual harassment resulting in disciplinary probation and discharge).

Mr. Gibson was not acting alone in his assessment of Mrs. Huck. Ken Winchester noted initial problems at the beginning of her tenure which he reported to Mr. Carter, the Manpower Coordinator. After Mr. Gibson experienced further problems, he requested a second opinion from Mr. Carter, who observed Mrs. Huck's performance. Despite Gibson's discussions with her on the job, Mr. Carter and Mr. Gibson concluded that it was necessary to give Mrs. Huck a formal warning in the departmental office. Approximately two days after this warning Mr. Gibson concluded Mrs. Huck's performance had not changed.

Two additional days do not represent a substantial length of time for change to occur; however, after a formal meeting of the nature plaintiff experienced, a response from Mrs. Huck would be appropriate. An argument that the interval of time between the formal warning meeting and dismissal was too short is equally open to attack had a longer period elapsed without an additional formal warning and an impression being given that work performance had sufficiently improved.

Mr. Gibson's termination decision was implemented only after further consultation with Mr. Carter and consultation with General Superintendent Oscar Pifer, both of whom concurred in the decision. This consultation demonstrates that the decision

was not rash. It does not negate the potential for discriminatory impact, however, it does not appear in this case.

 The case law has not extensively dealt with factual situations involving alleged discriminatory treatment of newly hired[5] private probationary employees.[6] As a newly hired probationary employee, this Court may only determine whether plaintiff experienced gender-based discrimination. In the absence of such discrimination, the reasons for discharge are not reviewable except for the purpose of inferring any discriminatory intent. *See Reeb v. Marshall,* 626 F.2d 43, 45 (8th Cir.1980). Where discriminatory intent is lacking, the Court cannot impose its opinion regarding sufficiency of the probationary employee's job performance to an employment decision which by contract is solely that of the employer.

## CONCLUSIONS

 This case involves a situation of alleged discrimination against this individual plaintiff, and no evidence was presented concerning a pattern and practice of discriminatory treatment by this defendant which was ongoing in nature. This type of case being fact sensitive, requires that the Court carefully examine the totality of evidence, and the Court concludes that Whirl-

pool's articulated reasons for dismissing plaintiff are not pretextual, but were based upon valid and plausible considerations related to business decisions reasonably attributed to all probationary employees. To be sure, Whirlpool employees in some instances did not exercise the best judgment or handle the situation in the most ideal manner, but the Court does not feel the necessary intent to discriminate was present, but rather the true motive and objectives were to discharge an employee whom certain supervisors felt did not possess the necessary skills and/or attitude to warrant being hired on a permanent basis.

Plaintiff's inadequate job performance warranted her discharge since her work attributes were inferior to other employees similarly situated. Plaintiff was not meeting acceptable or normal job requirements as demonstrated by the highest rejection rate for improperly painted condenser coils and a limited or unacceptable ability to perform or transfer (1) to leak testing, by self admission, or (2) to hammering "return bends," by limited dexterity and poor attitude due to chain smoking. The fact that this production line was not meeting and historically had not met, the company's production rate cannot insulate the plaintiff from dismissal. The evidence proved that

5. Newly hired private probationary employees:
 (1) Class action,
 *Durant v. Owens-Illinois Glass Co., Inc.,* 517 F.Supp. 710, 722 (E.D.La.1980) (30 day probationary employees)
 (2) Labor contract provision,
 *Causey v. Ford Motor Co.,* 516 F.2d 416, 424 (5th Cir.1975) (Discretion of employer to rehire laid off probationary employees).

6. A cross section of the "probation" cases fall into either discipline or job category areas:
 (1) Federal and/or civil service employees,
 *Reeb v. Marshall,* 626 F.2d 43 (8th Cir.1980) (Civil Service probationary employee claim of gender discrimination)
 *Churchwell v. United States,* 545 F.2d 59 (8th Cir.1976) (probationary registered female nurse denied pretermination hearing as a federal employee)
 *Sayah v. United States,* 355 F.Supp. 1008 (C.D.Ca.1973) (Terminated federal probationary employee)
 *Holden v. Finch,* 446 F.2d 1311 (D.C.Cir.1971) (Claim of political discrimination by federal

employee upon termination at the end of probationary period)
 (2) Professional,
 *Dorsten v. Lapeer County General Hospital,* 521 F.Supp. 944 (E.D.Mich.1981) (revocation of physician's probationary staff privileges due to her gender)
 (3) University professors and teachers,
 *Davis v. Weidner,* 596 F.2d 726 (7th Cir.1979) (female professor claim of discrimination upon termination of her assistant teaching position as an annually reviewable probationary faculty member)
 *Schwabenbauer v. Board of Education,* 498 F.Supp. 119 (W.D.N.Y.1980) (teacher credit while on probationary status)
 *Lieberman v. Gant,* 474 F.Supp. 848 (D.C. Conn.1979) (teacher denied tenure)
 (4) Goal requirement,
 *Piva v. Xerox Corp.,* 654 F.2d 591 (9th Cir. 1981) (gender discrimination and probationary status regarding sales goals)

plaintiff was slow and her work was inferior. This performance on the line distinguished her from the others and in turn she contributed in a greater manner to the continuing inadequate rate of production. Merely because the line failed to meet the projected rate does not require dismissal of all or none of the employees when one stands out as performing in a less adequate manner in comparison to the others. A probationary employee can expect to be assisted, advised and watched. Title VII requires that Mrs. Huck not be discriminated against due to her gender; however she must expect that her employer will be determining her ability and attitude for being a minimally acceptable worker.

In light of the foregoing, plaintiff's claim for relief sought in her complaint pursuant to Title 42 U.S.C. § 2000e *et seq.* is hereby DENIED.

IT IS SO ORDERED.