The INDIANA CIVIL RIGHTS COMMIS-SION and Lois A. Williams, Appellants (Respondents Below),

v.

MIDWEST STEEL DIVISION OF NA-TIONAL STEEL CORPORATION, Appellee (Petitioner Below).

No. 3–282A22.

Court of Appeals of Indiana, Third District.

June 29, 1983.
Rehearing Denied Sept. 7, 1983.

Linley E. Pearson, Atty. Gen., Frederick S. Bremer, Deputy Atty. Gen., Indianapolis, for appellant Indiana Civil Rights Com'n.

Alice M. Craft, Indianapolis, for appellant Lois A. Williams.

William T. Coleman, Mark L. McGowan, Naphin, Banta & Cox, Chicago, Ill., James H. Douglas, Douglas, Douglas & Douglas, Valparaiso, for appellee Midwest Steel Div. of National Steel Corp.

GARRARD, Judge.

The Indiana Civil Rights Commission (Commission) and Lois Williams appeal from the trial court's reversal in part and modification in part of an award made by the Commission in favor of Williams. Williams had complained to the Commission that Midwest Steel Division of National Steel Corporation (Midwest) had discriminated against her on the basis of sex.

Lois Williams began her employment at Midwest on December 28, 1972. She worked on the electrolytic tinning line and carried the job designation of a Class 2 laborer. On January 1, 1973 she was assigned a Class 8 position of stocker on the chrome and tin line. The stocker's job was discontinued on February 7, 1973 and Williams returned to the Class 2 laborer's position on the tinning line. On February 12, 1973 Williams became a feeder-helper on the line. She was removed from that position and relegated to the laborer's job on March 15, 1973.

On May 14, 1973 Williams began crane operator's training. A crane operator's position was a Class 8 position but during the training Williams received a laborer's pay. On June 8, 1973 Williams failed the crane operator's examination and she was reassigned to her laborer's job.

The facts disclose that in 1973, 13 persons, 11 males and 2 females, took the crane operator's examination. Williams, the other female and four males failed their initial examinations. These four males received additional training and upon reexamination passed the test. After her initial failure, Williams was again assigned to the laborer's position. She was not given additional training on the crane or allowed to retake the examination.

On July 23, 1973 Williams began a sick leave which continued until November 12, 1973.

On November 8, 1973 a company physician examined Williams and determined she was fit to return to work.

Williams returned to work as a laborer on Monday, November 12, 1973. She talked with the supervisor of employment and placement after her shift ended on November 16, 1973. After that conversation Williams left her employment with Midwest.

Williams filed a complaint with the Indiana Civil Rights Commission on February 5, 1974, alleging Midwest had discriminated against her on the basis of sex.

The hearing on the complaint was held on five days during March, April and May of 1976. On February 17, 1977 the hearing officer rendered his recommendations to which both Midwest and Williams objected. The Indiana Civil Rights Commission held a hearing on the parties' objections on May 19, 1977. The Commission issued findings of facts, conclusions of law and an order on January 10, 1978. The Commission found these facts relevant to the discrimination issue:

" . . .

8. In 1973 thirteen (13) persons were trained and tested for the job of Crane Operator on the E.T.L. crane, eleven (11) males and two (2) females, who were Williams and another female, Marie Evans. Seven (7) males passed on their first test. Williams, Evans and four (4) males failed. All four (4) males who failed received additional training and later passed the test. After the training Evans did not wish to become a Crane Operator and either intentionally failed the test or voluntarily withdrew.

9. There are two parts to the Crane Operator's test: (1) knowledge of safety rules and operating procedures, and (2) operational or proficiency test. Williams received a score of forty-eight (48) on the safety portion of her test. The minimum passing safety score was fifty (50). Williams was higher than three (3) other males who scored respectively fourteen (14), thirty-seven (37), and forty-two (42), all of whom later passed. J. Broton, male, who received a score of fourteen (14) and failed the test on February 3, 1972 was re-tested the following week, passed the test and became a Crane Operator. T. Boyd, male, who failed the test on February 2, 1973, was re-tested the following week, passed the test and became a Crane Operator. D. Nickles, male, failed the test on February 4, 1973, was re-tested the following week, passed the test and became a Crane Operator.

10. According to her examiner, George Paulsen, Williams failed the operational or proficiency portion of her test because she had too much swing in her hooks and had difficulty in coupling and uncoupling her hooks to the coil. (Record, 793-4).

11. On the average, a Crane Operator is given approximately two (2) weeks or eighty (80) hours of training. Williams had approximately three (3) weeks or one hundred twenty (120) hours of training. Training consists of riding in the cab with the Crane Operator, observing the Crane Operator operate the various controls, and the trainee taking the controls under the supervision of the Crane Operator during slack periods of work operation. The training which the trainee receives is highly variable. Some trainees need very little training, others require relatively more. The amount of actual practice which the trainee receives is also highly variable, depending on how helpful the Crane Operator is and the demand or use of the crane during the training period. Williams received six (6) hours or less of actual practice on the crane

prior to her examination. The employer has a policy that all persons failing the test initially have the opportunity to brush up on their weak points and to be re-tested. The additional training is not formal training, but rather "brushing up on weak points only" and then re-testing. (Complainant's Exhibit 26).

12. At the conclusion of her Crane Operator's test on June 8, 1973, Williams' examiner, George Paulsen, signed her test form, MW–945, which included a statement, "Lois Williams is not at this time qualified to run a (sic) overhead crane, needs more training." (Complainant's Exhibit 11). Under employer's policy and the strong implication of the written statement on her examination form, Williams was to receive more training for the Crane Operator's position.

13. At the conclusion of her Crane Operator's examination, Louis (Bud) Miller advised Williams that she had had enought Crane Operator training and expressly or by implication indicated that she would not be given further tests. (Record, 45). As noted above, eleven (11) out of eleven (11) males who took the Crane Operator's test for the E.T.L. crane during the calendar year 1973 passed the test and became crane operators. Four (4) out of the eleven (11) failed the first test and at least three (3) of the four (4) re-tested and passed the test the week immediately following their failure. Therefore, based upon her sex, Williams was intentionally denied the opportunity to take further training and testing for such job by the employer.

i. On July 23, 1973, Williams took a sick leave which lasted until November 12, 1973, during which time she received employer provided sick pay benefits;

j. On November 8, 1973, she was examined by the company physician, Dr. Lynn Tedrick, to determine if she could return to work (Williams had had surgery on both feet in September, 1973, and part of his examination included her feet);

k. On Monday, November 12, 1973, Williams returned to work as an E.T.L. laborer;

15. On November 16, 1973, Williams, who was upset, stated to personnel clerk, Noreen McClendon, just before Williams talked to Edward Lewis, "My feet hurt and I am going to have to quit." (Record, 505). Williams' Termination Interview Form states reasons given by employee for termination, "Quit—cannot work because of sore feet." (Complainant's Exhibit 14).

1. On Friday, November 16, 1973, after her work shift, at approximately four o'clock (4:00) p.m., Williams proceeded from her work shift area to the personnel office in another building where she talked to Edward Lewis, Supervisor of Employment and Placement, who later died in December, 1974; Williams talked to Lewis approximately twenty (20) minutes and thereafter left her employment with Midwest and has not worked there since (Williams contends that she was "forced to quit" because Lewis would not grant another sick leave; the Midwest contends she outright quit).

17. The operation of the crane is an easy physical job. The crane is operated by electrical controls governed by levers operated by use of the hands. The operator may either sit or stand. (Record 597–9). No evidence was presented that complainant was physically or intellectually incapable of learning to operate the crane. The Commission takes official notice that women are neither physically or intellectually inferior to men in jobs which require relatively light physical effort. Because eleven (11) out of eleven (11) men who took the Crane Operator's test in 1973 passed such test, it is very probable that Williams would have passed had she been given the opportunity for further training and an additional test. Williams wanted the Crane Operator's job and wishes to go back to the company as a Crane Operator (Record, 958–9).

18. The laborer's job, at which Williams was working during her last week of employment, requires substantial walking and standing. Williams left employment be-

cause her feet hurt. If Williams had been granted the Crane Operator's job she would not have been required to walk and stand for long periods of time. It is more likely than not that Williams' feet would not have hurt in the Crane Operator's job and, therefore, she would not have left her employment. The Commission concludes that "but for" Midwest's act of sex discrimination, Williams would not have left her employment.

19. After leaving her employment with Midwest, Williams made efforts to find other work, but only had limited success. Williams had additional operations on her feet in 1974 and 1975 during which times she was temporarily disabled. (Record, 101 and following.)

20. Any conclusion of law which should have been deemed a Finding of Fact is hereby adopted as such."

The Commission entered these conclusions of law:

"1. An employer is bound to provide equal opportunity without regard to sex which includes that chance to use equal skill, efforts, responsibility, and job performance under similar working conditions, including equal opportunity for training and testing for promotions, as well as equal pay for the same job. Midwest is bound to provide such equal opportunity without regard to sex by reason of statute, including, the Indiana Civil Rights Law, agreement between management and union, and consent decrees in evidence to which Midwest is a party.

2. The burden of proof is upon the Complainant to prove sex discrimination by substantial, reliable, and probative evidence, meaning that she must prove that it is more likely than not that she was in fact discriminated against by reason of her sex.

3. Under the Indiana Civil Rights Law one of the avowed or express purposes of the act, IC 1971, 22–9–1–2 is to provide to all citizens of Indiana equal opportunity in employment. Thereunder, the practice of denying equal employment opportunity on the basis of sex is considered a discriminatory practice, and the act shall be construed broadly to effectuate its purpose. Under IC 22–9–1–3(p) the term "sex" as it applies to segregation referred to in the act, applies to all types of employment.

4. Williams was discriminated against on the basis of her sex with regard to her training and testing as a Crane Operator specifically as follows:

a. She was denied opportunity for additional training in violation of an employer policy which was applied to males which allowed them to "brush up on weak points."

b. She was effectively denied the opportunity to re-test by statements of Louis (Bud) Miller in violation of an Employer policy which was applied to males allowing them "the opportunity to brush up on their weak points and be re-tested."

5. Williams is entitled to relief in the form of back pay wages, from the date of the discriminatory act on June 8, 1973, to the date of the Commission's decision herein.

6. The Complainant timely filed her complaint with the Commission.

7. The Hearing Officer's Recommendation relied on an interpretation of IC 22–9–1–6(k)(1) that the Commission's power in employment cases is limited to awarding "wages, salary, or commissions." The material portion of that subsection reads as follows:

'. . . if the commission finds a person has engaged in an unlawful discriminatory practice, it may cause to be served on such person an order requiring such person to cease and desist from the unlawful discriminatory practice and requiring such person to take further affirmative action as will effectuate the purposes of this chapter, including but not limited to the power to restore Complainant's losses incurred as a result of discriminatory treatment, as the Commission may deem necessary to assure justice, Provided, however, that this specific provision when applied to orders pertaining to employment shall include only wages, salary, or commission;' IC 22–9–1–6(k)(1).

Obviously, the General Assembly has imposed some limitation by the emphasized portion of section 6(k)(1). The crucial question is what provision is meant by the words 'this specific provision.' The use of the word 'specific' rather clearly implies something different from a general provision and the use of the word 'provision' implies something less than the subsection. Thus the limitation applies to a specific part of subsection 6(k)(1). The commission concludes that the specific part is 'the power to restore Complainant's losses incurred as a result of discriminatory treatment' and therefore that the limitation relates to the kinds of monetary awards that can be made in employment cases. Under this interpretation, the Commission can order the Respondent to take affirmative action to effectuate the purposes of the Civil Rights Law, which affirmative action can include reinstatement with retroactive seniority.

8. Williams having completed her probationary period, cannot complain on her own behalf about probationary discharge or denial of transfers to probationary employees. Therefore, with respect to those allegations, she is not a 'complainant' under IC 22–9–1–3(n). Since a complaint is a 'written grievance filed by a complainant,' IC 22–9–1–3(o) and since '[t]he commission shall not hold hearings in the absence of a complaint,' IC 22–9–1–6(e), the commission has no jurisdiction over such allegations.

9. There is insufficient evidence supporting a claim that Midwest assigned Williams duties in a sexually discriminatory manner.

10. There is insufficient evidence supporting a claim that Midwest discriminated against Williams because of sex with respect to break periods.

11. Assuming arguendo that Williams' waiver of her competitive seniority was coerced because of sex, such coercion caused no harm, as she was allowed to withdraw the waiver upon her first request.

12. There [is] insufficient evidence supporting a claim that Midwest discriminated against Williams because of sex by retaliating against her for asserting contractual and statutory rights.

13. It is apparent that the Complainant believed that the phrase in the complaint 'I believe this is part of a pattern of treatment of women at MWS' authorized the litigation of a variety of allegations of discrimination against persons other than herself. This belief is incorrect. The only persons authorized by the statute to complain on behalf of others are the Director and Deputy Director. IC 22–9–1–3(n).

14. Midwest is subject to Executive Order 11246 and the various regulations thereunder and is thus already required to undertake affirmative action to eliminate sex discrimination.

15. It would be unjust to impose additional affirmative action obligations on Midwest.

16. Any finding of fact which should have been deemed a conclusion of law is hereby adopted as such.

## ORDER

1. Respondent shall immediately offer to the complainant a position as a Crane Operator. Respondent shall credit complainant with seniority as if her employment with Midwest has been uninterrupted. Respondent may require complainant to successfully complete the training for said position before performing as a Crane Operator. Should complainant refuse this offer, respondent shall have no obligation to hire her that results from this Order.

2. Respondent shall cease and desist from providing less training for females than for males in preparation for meeting its requirements for holding any particular job.

3. The case is remanded to the Hearing Officer to determine the monetary loss complainant 'incurred as a result of discriminatory treatment,' see IC 22–9–1–6(k)(1). The Hearing Officer's recitation of the manner of calculating this loss is essentially correct. However, it should be noted that any loss attributable to failure on complainant's part to take reasonable steps to secure

employment are not losses 'incurred as a result of discriminatory treatment' and are thus, not compensable. The burden of proof on that issue rests with respondent."

Midwest Steel filed a petition for review of administrative order with the Porter Superior Court on February 28, 1978. Following arguments the court granted Midwest's petition for a stay of the order of the Commission. Arguments on the merits were heard on October 10, 1978 and the cause was taken under advisement.

On April 17, 1981 the court entered its judgment. It upheld the Commission's findings and conclusions with regard to the determination of discrimination on the part of Midwest. However, the court found the Commission's finding No. 18 [1] to be "unsupported by substantial evidence and it is based on speculation and is an abuse of discretion." Whereas the Commission had ruled Williams left her employment because of the discrimination, the trial court concluded "Williams voluntarily left the employment of Midwest."

The court determined the back wages owed were the difference between Class 8 and Class 2 wages *but only for the period from June 8, 1973 through July 23, 1973 and November 8, 1973 through November 12, 1973.*

The Commission had found back wages to be owed up to the date the Commission entered its decision.

The court also found the Commission erred in ordering that Williams be reinstated under IC 22–9–1–6(k)(1). The court concluded:

"5. IC 22–9–1–6(k)(1) limits the Indiana Civil Rights Commission's power in employment cases to awarding 'wages, salaries and/or commissions' and there-

fore the Indiana Civil Rights Commission's Conclusions of Law No. 7 in which it concluded it had the right to order reinstatement with retroactive seniority was contrary to law."

In its judgment the court vacated the Commission's order and ordered that Midwest pay Williams $181.44 in back wages.

The Commission and Williams now appeal from the trial court's judgment.

The appellants raise three issues, which we state as:

1. Did the trial court err in holding the Commission's finding No. 18 to be unsupported by substantial evidence, based on speculation and an abuse of discretion?

2. Is reinstatement a remedy available under IC 22–9–1–6(k)(1) where an employee has been constructively discharged as a result of discriminatory acts of the employer?

3. Did the trial court act outside its authority when it did not remand the case to the Commission?

ISSUE 1:

The Commission and the trial court both found Midwest had discriminated against Williams. The primary discriminatory act was Midwest's refusal to continue Williams' training on the crane after she failed the first examination. By allowing the males who had failed to "brush-up" and retake the examination Midwest was discriminating against Williams on the basis of sex.

The hearing officer and the Commission determined Williams left her employment because of the discriminatory acts of Midwest. In essence, the Commission argues Williams was *constructively discharged* [2]

---

1. "18. The laborer's job, at which Williams was working during her last week of employment, requires substantial walking and standing. Williams left employment because her feet hurt. If Williams had been granted the Crane Operator's job she would not have been required to walk and stand for long periods of time. It is more likely than not that Williams' feet would not have hurt in the Crane Operator's job and, therefore, she would not have left

her employment. The Commission concludes that 'but for' Midwest's act of sex discrimination, Williams would not have left her employment."

2. As authority for this doctrine of constructive discharge the Commission cites *Meyer v. Brown & Root Construction Company* (5th Cir. 1981), 661 F.2d 369, 372, wherein the court stated:

from her employment. The Commission found a direct causal link between the discriminatory act of Midwest and Williams quitting. We construe the Commission's analysis to be as follows: Williams' feet hurt because she had to stand all day in fulfilling her duties as a laborer; she was a laborer because she was not a crane operator; and she was not a crane operator because Midwest had discriminated against her on the basis of sex.

Midwest argues Williams voluntarily left her job because her feet hurt as a result of wearing the "mill" shoes. Midwest stresses the fact that Williams filed no grievance after she quit. Midwest contends that had Williams left because of an unlawful company action, she would have filed a grievance. Since she did not, the only reasonable inference is that she quit her job voluntarily and not because of any discriminatory act or denial of benefits on the part of Midwest.

The trial court found the evidence supported Midwest's contentions and accordingly found the Commission's finding No. 18 to be unsupported by the evidence, based on speculation, and an abuse of discretion.

The Commission contends the trial court was acting contrary to the proper scope of review when it found finding No. 18 to be unsupported by the evidence.

The issue of whether Williams left her job voluntarily must be resolved before the relief appropriate under the circumstances can be determined.

If she left her job solely of her own volition, Williams is entitled to the back wages accrued until November 16, 1973, the day she quit. However, if her departure was causally attributable to Midwest's discriminatory acts, then at minimum she is entitled to back wages until the date of the Commission's decision. Also, if IC 22–9–1–6(k)(1) so provides, she would be entitled to reinstatement as a crane operator if she can pass the examination.

"Constructive discharge will be found where an employer has made working condi-

A trial court, in reviewing an administrative decision, should follow the dictates of IC 4–22–1–18:

"On such judicial review such court shall not try or determine said cause de novo, but the facts shall be considered and determined exclusively upon the record filed with said court pursuant to this act.

On such judicial review if the agency has complied with the procedural requirements of this act, and its finding, decision or determination is supported by substantial, reliable and probative evidence, such agency's finding, decision or determination shall not be set aside or disturbed.

If such court finds such finding, decision or determination of such agency is:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or

(2) Contrary to constitutional right, power, privilege or immunity; or

(3) In excess of statutory jurisdiction, authority or limitations, or short or statutory right; or

(4) Without observance of procedure required by law; or

(5) Unsupported by substantial evidence, the court may order the decision or determination of the agency set aside. The court may remand the case to the agency for further proceedings and may compel agency action unlawfully withheld or unreasonably delayed.

Said court in affirming or setting aside the decision or determination of the agency shall enter its written findings of facts, which may be informal but which shall encompass the relevant facts shown by the record, and enter of record its written decision and order or judgment."

A trial court cannot weigh conflicting evidence, which appears in the record of the hearing, for the purpose of determining for whom it preponderates. If there is any substantial evidence to support the finding of the Commission, the court may not disturb the Commission's decision.

tions so difficult that a reasonable person would feel forced to resign."

*Indiana Education Employment Relations Board v. Board of School Trustees of Baugo Community Schools* (1978), Ind.App., 176 Ind.App. 680, 377 N.E.2d 414, 416. But an administrative determination must have a reasonably sound basis of evidentiary support. Further, the reasonableness of the inferences which an administrative agency employs to arrive at ultimate facts is a question appropriate for judicial determination, a "question of law." *Indiana Civil Rights Commission v. Sutherland Lumber Co.* (1979), Ind.App., 394 N.E.2d 949, 952.

We thus must consider whether the Commission's determination that a constructive discharge occurred has a reasonably sound basis of evidentiary support.

Williams was on sick leave from June until November of 1973. She returned to work as a laborer on November 12. Williams testified that after her shift on November 16, she met with Ed Lewis in the personnel department. (Mr. Lewis died before the hearing was conducted.) No one else was present at the meeting between Williams and Lewis. Under her version of the facts, Williams asked Lewis for a second sick leave because her right foot was sore. Lewis replied she could not have another sick leave because she had just been on one. Lewis told her she had no alternative but to quit, so Williams did. Midwest concedes in its brief that Williams was entitled to a second sick leave under the circumstances. Midwest asserts Williams did not request the additional sick leave, rather she just quit.

The Commission argues the evidence as presented in Williams' testimony, along with the surrounding circumstances, reasonably leads to the conclusion that a constructive discharge occurred.

No evidence exists that the laborer's position to which Williams was assigned was made so difficult she was forced to resign. Rather her physical condition apparently made standing all day, as required by that job, intolerable. Williams quit because she could not tolerate the constant standing required in the laborer's position. No direct approbrious action occurred on the part of Midwest causing Williams to leave her job after she had returned for only a week. The question then is whether it was reasonable for the Commission to infer that *but for* the discriminatory act Williams would have qualified as a crane operator and, so employed, remained on the job.

■ The record contained evidence that a crane operator did not have to stand during the entire work shift in order to operate the machinery. The crane was controlled from a cab in which the operator could sit as he or she maneuvered the machinery by manipulating lever controls with their hands. Whether Williams could have performed these tasks is unknown since Midwest denied her the opportunity to "brush up" on the crane operation and retake the examination. It is true that no guarantee exists that further training would qualify Williams as a crane operator. However, all those males who initially failed the examination later passed after they were permitted more training. We believe it reasonably inferrable that the consequence of further training of Williams would be that she would have qualified as a crane operator. We note that on the safety portion of the test Williams received a higher score than three of the males, each of whom later became crane operators. To hold that Williams could not possibly pass the examination upon the facts of record would be to engage in a presumption totally contrary to the basic tenets of our civil rights law. IC 22–9–1–2 provides "It is the public policy of the State of Indiana to provide all of its citizens equal opportunity for . . . employment." We recognize that the Commission, in finding Williams was constructively discharged, had to assume that given the opportunity Williams would have qualified as a crane operator. We believe that this assumption was permissibly made, and under the present facts, required in order to effectuate the equal opportunity in employment rights guaranteed to all citizens. Otherwise, Williams would be denied employment opportunity solely on the basis of sex.

We find substantial evidence supporting the Commission's finding No. 18. The Com-

mission's "but for the discriminatory act Williams would still be an employee" analysis is based on inferences which could be reasonably drawn from the evidence. Accordingly the trial court erred in holding the Commission's finding No. 18 to not be supported by the evidence and an abuse of discretion. We conclude the Commission did not err in determining Williams' leaving Midwest was a direct result of the discriminatory act of denying her "brush-up" training on the crane and reexamination.

ISSUE 2:

If Williams did leave her employment as a direct result of Midwest's discriminatory act, is she entitled to reinstatement under IC 22–9–1–6(k)(1)?

IC 22–9–1–6 provides: The commission shall have the following powers and duties:

"(k)(1) To state its findings of fact after a hearing and, if the commission finds a person has engaged in an unlawful discriminatory practice, it may cause to be served on such person an order requiring such person to cease and desist from the unlawful discriminatory practice and requiring such person to take *further affirmative action as well effectuate the purposes of this chapter, including but not limited to the power to restore complainant's losses incurred as a result of discriminatory treatment, as the commission may deem necessary to assure justice,* Provided, however, that this specific provision when applied to orders pertaining to employment shall include only wages, salary or commissions; to require the posting of notice setting forth the public policy of Indiana concerning civil rights and respondent's compliance with said policy in places of public accommodations; to require proof of compliance to be filed by respondent at periodic intervals; to require a person who has been found to be in violation of the Indiana Civil Rights Law, and who is licensed by a state agency authorized to grant a license, to show cause to the licensing agency why his license should not be revoked or suspended." (Emphasis added.)

Under the authority of this statute the Commission ordered Midwest to reinstate Williams and allow her to train on the crane and take the operator's examination.

The trial court found that reinstatement was not a remedial power available to the Commission under IC 22–9–1–6(k)(1).

We believe the trial court erred in its interpretation of the statute. The statute provides the Commission with the authority to order persons engaging in unlawful discrimination to:

(1) Cease and desist from the unlawful discriminatory practice;

(2) Require such person to take further affirmative action as will effectuate the purpose of the chapter

(a) *including but not limited to* the power to restore complainant's losses incurred as a result of discriminatory treatment, as the Commission may deem necessary to assure justice,

(i) Provided, however, that *this specific provision* when applied to orders pertaining to employment shall include only wages, salary or commissions.

We believe the phrase which we have designated (i) limits the *monetary losses* an individual may receive but it does not preclude other affirmative remedial powers such as reinstatement.

The Commission contends the limiting phrase modifies only "the power to restore complainant's *losses* incurred as a result of discriminatory treatment," and does not exclude affirmative relief such as reinstatement. We agree.

Midwest contends that where an employee is discriminated against and, as a result, leaves her employment, her only relief available is an award of monetary damages. The trial court adopted this interpretation of the statute. However, we do not believe IC 22–9–1–6(k)(1) was intended to be so narrowly construed that reinstatement is not a remedy available to the Commission to afford equitable relief where monetary damages alone do not assure equal employment opportunity.

IC 22–9–1–2(e) states that the civil rights act "shall be construed broadly to effectuate its purpose." When searching for the legislature's intent we are guided by rules of statutory construction.

"It is well settled that the foremost objective of the rules of statutory construction is to determine and effect the true intent of the legislature. *Loza v. State* (1975), 263 Ind. 124, 325 N.E.2d 173; *Thompson v. Thompson* (1972), 259 Ind. 266, 286 N.E.2d 657; *State v. Gilbert* (1966), 247 Ind. 544, 219 N.E.2d 892. It is also well settled that the legislative intent as ascertained from an Act as a whole will prevail over the strict literal meaning of any word or term used therein. *State v. George* (1980), Ind., 401 N.E.2d 680; *Combs v. Cook* (1958), 238 Ind. 392, 151 N.E.2d 144; *Brown v. Grzeskowiak* (1951), 230 Ind. 110, 101 N.E.2d 639, 102 N.E.2d 372. When the court is called upon to construe words in a single section of a statute, it must construe them with due regard for all other sections of the act and with due regard for the intent of the legislature in order that the spirit and purpose of the statute be carried out. *Indiana State Highway Commission v. White* (1973), 259 Ind. 690, 291 N.E.2d 550."

*Park 100 Development Company v. Indiana Department of State Revenue* (1981), Ind. 429 N.E.2d 220, 222.

IC 22–9–1–6 states the person discriminating may be required "to take further affirmative action as will effectuate the purposes of this chapter, *including but not limited to* the power to restore complainant's losses...." Thus we find the award of losses is but one method available to the Commission by which it may correct instances of unlawful discrimination. The purpose of the limitation that "orders pertaining to employment shall include only wages, salary or commissions," is to prohibit an award of *monetary damages* for feelings of embarrassment or insult which may arise out of discriminatory acts such as sexual harassment. As we noted in *Indiana Civil Rights Comm. v. Holman* (1978), Ind.App., 177 Ind.App. 648, 380 N.E.2d 1281:

"A careful reading of IC 22–9–1–6(k)(1), *supra,* clearly shows that no provision is made for compensation for racial insult. The statute empowers the Commission to restore a complainant's losses. We hold that the losses referred to in this statute are pecuniary losses which can be proved with some degree of certainty, such as where a person has been denied employment, or living accommodations, or business in violation of the Civil Rights Act where that violation results in actual pecuniary loss.

Although IC 22–9–1–6(k)(1), *supra,* does not limit the Commission to simply restoring losses, it does not specifically empower the Commission to award damages as compensation for racial insult, either. An administrative agency has only those powers which are specifically conferred by statute, and all doubtful claims to power by a governmental agency must be resolved against it. [citations omitted]"

Thus, while the type of loss which may be awarded is controlled by the statute, the remedial power of reinstatement is certainly not precluded.

Further, an award of back pay is an available remedy. The question, though, is for what period shall the pay be awarded? In theory, if a person left her job because of the unlawful discrimination of an employer, then she would be entitled to pay until she could find comparable employment, for however long that might be. However, if the Commission has the power of reinstatement, it may order an employer to offer employment to the employee, thus establishing a cut-off time for back pay. The appellees have not persuaded us that IC 22–9–1–6(k)(1) precludes the affirmative relief of reinstatement.

Under federal civil rights law, as provided in 42 U.S.C.A., Section 2000e–5(g) reinstatement is one of the specified remedial actions available.

"(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful

employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title."

We perceive no legislative intent nor other reason why our Civil Rights Commission should not have the power to order reinstatement when necessary to effectuate the purposes of the act.

It follows that the trial court was in error. Its decision is reversed with instructions to reinstate the order of the Commission.

Reversed and remanded.

HOFFMAN, P.J., and STATON, J., concur.