**INDIANA DEPARTMENT OF CORRECTION, Gordon H. Faulkner, Commissioner, Indiana Department of Correction, Indiana Reformatory, and Norman Owens, Petitioners-Appellants,**

v.

**INDIANA CIVIL RIGHTS COMMISSION, and Judith A. Samuelson, Respondents-Appellees.**

No. 1–1284A299.

Court of Appeals of Indiana, First District.

Dec. 19, 1985.

Rehearing Denied Feb. 4, 1986.

Linley E. Pearson, Atty. Gen., David Steiner, Deputy Atty. Gen., Indianapolis, for petitioners-appellants.

Michael C. Healy, Indianapolis, for respondents-appellees.

RATLIFF, Presiding Judge.

## STATEMENT OF THE CASE

The Indiana Department of Correction (DOC) appeals from a judgment entered in the Hendricks Circuit Court affirming the Findings of Fact, Conclusions of Law, and Order rendered by the Indiana Civil Rights Commission (ICRC) in favor of Dr. Judith A. Samuelson. The ICRC found that the DOC unlawfully discriminated against Dr. Samuelson on the basis of her sex and ordered the DOC to offer her the Director of Education position when the next vacancy occurred. We affirm.

## FACTS

The DOC operates several correctional institutions throughout the state including the Indiana Reformatory. Located near Pendleton, Indiana, the Reformatory is a maximum security institution for adult male felons. As late as January 1982, it housed nearly 2,000 inmates. *See French v. Owens* (S.D.Ind.1982), 538 F.Supp. 910.[1] By and large these inmates are kept in the Reformatory's general population regardless of their criminal history.

In July 1979, the DOC sought applications for the Director of Education and Assistant Director of Education positions at the Reformatory. The director supervises the entire education program at the Reformatory. His other duties include establishment of curriculum, assignment of teachers, preparation of budgets, formulation of federal grant proposals, and counseling of individual student-inmates. The assistant director generally aids the director in the performance of these duties. In addition, the assistant director is directly responsible for the day to day operation of the Reformatory's school which serves 300 to 350 student-inmates at any one time. The only qualification listed by the DOC for these positions was a secondary school administrator's license. Additionally, three to five years of teaching experience was listed as "highly desirable."

In response to its request, the DOC received 31 applications. The DOC selected ten of these applicants for interviews including Dr. Samuelson. Following the interviews, the DOC offered the positions to two men.[2] Both Donald Hipes, who was appointed to the director's position, and Donald Fishback, who was appointed to the position of assistant director, were described by the interview committee members as "tough guys" or "real hard cookies" who would "kick ass" and get the job done. Dr. Samuelson, on the other hand, was viewed as too positive as if she were "trying to sell a necktie." Finding of Fact No. 26, Record at 53. Clearly, each of these applicants possessed qualifications in excess of those required by the DOC for both positions.

On October 22, 1979, Dr. Samuelson filed a complaint with the ICRC alleging that the DOC had engaged in sex-based employment discrimination when filling the director's and assistant director's positions. Following an administrative hearing, the hearing officer entered extensive findings of fact and conclusions of law. In addition, he recommended that the ICRC adopt an order requiring, in part, that the DOC offer Dr. Samuelson the director's position when it next became vacant. On December 17,

---

1. In *French v. Owens,* the federal district court ordered the Reformatory to make numerous improvements in the conditions at the Reformatory including the reduction of its inmate population.

2. Originally, the director's position was offered to Miles Reynolds. However, he had accepted other employment following his interview and, thus, declined the offer.

1981, the ICRC did in fact adopt the hearing officer's Recommended Findings of Fact, Conclusions of Law and Order.

Subsequently, the DOC sought judicial review pursuant to Indiana Code section 4–22–1–14. On March 28, 1983, the Hendricks Circuit Court entered an order affirming the ICRC's Findings of Fact, Conclusions of Law and Order. Upon appeal from that judgment, this court, in a memorandum decision, reversed and remanded to the trial court for the entry of specific findings of fact and conclusions of law. *Indiana Department of Correction v. Indiana Civil Rights Commission* (1984), 464 N.E.2d 29. The trial court subsequently complied with that decision. The DOC now appeals from that judgment.

## ISSUES

The parties' appellate arguments essentially raise four issues which require our attention. Those issues are:

1. Whether the Findings and Conclusions entered by the Hendricks Circuit Court are sufficient to permit intelligent appellate review by this court.

2. Whether the determination of the ICRC that the DOC had engaged in unlawful gender-based employment discrimination is contrary to law, unsupported by the findings, or unsupported by evidence in the record of administrative proceedings.

3. Whether the DOC established a valid bona fide occupational qualification of being male for both the director's and assistant director's positions.

4. Whether the remedy ordered by the ICRC exceeded the commission's statutorily delegated authority.

## DISCUSSION AND DECISION

*Issue One*

█ The DOC first asserts that the Findings and Conclusions entered by the Hendricks Circuit Court on remand are clearly inadequate requiring this court to once again reverse and remand to the trial court.[3] Indiana's Administrative Adjudication Act requires the trial court to enter written findings of fact when reviewing administrative agency determinations. Indiana Code section 4–22–1–18 (Burns Supp. 1985) states in part:

"(2) Said court in affirming or setting aside the decision or determination of the agency shall enter its written findings of facts, which may be informal but which shall encompass the relevant facts shown by the record, and enter of record its written decision and order or judgment."

Our trial rules also require the entry of specific findings in these circumstances. Indiana Rules of Procedure, Trial Rule 52(A)(2). The purpose behind this requirement is abundantly clear. Special findings provide both the parties and the reviewing court with the theory or theories upon which the lower court relied, thus facilitating appellate review. *Town of Rome City v. King* (1983), Ind.App., 450 N.E.2d 72, 77; *K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d 749, 754; *Roberts v. Wabash Life Insurance Co.* (1980), Ind.App., 410 N.E.2d 1377, 1385, *trans. denied; In re Marriage of Miles* (1977), 173 Ind.App. 5, 8, 362 N.E.2d 171, 174, *trans. denied.* Consequently, whether the findings are adequate depends on whether they are sufficient to disclose a valid basis under the issues for the legal result reached. *Morphew v. Morphew* (1981), Ind.App., 419 N.E.2d 770, 773; *K.B. v. S.B.*, at 754; *Roberts*, at 1385; *Miles*, 173 Ind.App. at 8, 362 N.E.2d at 174.

█ In the present case, the findings entered by the Hendricks Circuit Court on remand are not of the quality this court would ordinarily prefer to base its review upon. We have, however, been provided with the ICRC's comprehensive findings of fact and conclusions of law together with the administrative record upon which they were based. Moreover, the parties have

---

3. In its Appellant's Brief, the DOC also raises a related issue. It asserts that the trial court erred when it failed to review the ICRC's decision to determine whether it was supported by substantial evidence in the record of the administrative proceedings. Clearly, this issue is subsumed in our discussion of *Issue One.* We will not, therefore, discuss it separately.

presented extensive legal arguments despite the state of the trial court's findings. Under these particular facts, the trial court's findings and conclusions are not so inadequate as to impede our intelligent review of the substantive issues raised by the parties. *See Goffredo v. Indiana State Department of Public Welfare* (1981), Ind. App., 419 N.E.2d 1337, 1339, *trans. denied.* Hence, we proceed to a consideration of those issues.

*Issue Two*

The DOC next asserts that the trial court erred when it failed to reverse the ICRC's determination that it had engaged in unlawful gender-based employment discrimination. It argues specifically that such a determination was contrary to law, unsupported by the findings of fact, and unsupported by substantial evidence in the record. Before addressing the substance of this issue, we find it necessary to remind the parties of the standard of review the trial court was required to apply in this case.

■ Indiana Code section 4–22–1–18 (Burns Supp.1985), outlines the standards for judicial review of administrative determinations. It states in pertinent part:

"(a) On such judicial review, such court shall not try to determine said cause de novo, but the facts shall be considered and determined exclusively upon the record filed with said court pursuant to this chapter.

(b) On such judicial review, if the agency has complied with the procedural requirements of this chapter and its finding, decision, or determination is supported by substantial, reliable, and probative evidence, such agency's finding, decision, or determination shall not be set aside or disturbed.

(c) If such court finds such finding, decision, or determination of such agency is:

(1) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) Contrary to constitutional right, power, privilege, or immunity;

(3) In excess of statutory jurisdiction, authority, or limitations, or short [of] statutory right;

(4) Without observance of procedure required by law; or

(5) Unsupported by substantial evidence; the court may order the decision or determination of the agency set aside. The court may remand the case to the agency for further proceedings and may compel agency action unlawfully withheld or unreasonably delayed."

Judge Staton further explained a particularly pertinent portion of this standard when he stated in *Indiana Education Employment Relations Bd. v. Board of School Trustees* (1978), 176 Ind.App. 680, 377 N.E.2d 414:

"The board or agency, not the court determines the issues of fact. The court cannot weigh conflicting evidence, which appears in the record of the hearing, for the purpose of determining for whom it preponderates. If there is any substantial evidence to support the finding of the bcard or agency, the court may not disturb the board's or agency's decision. *Indiana Ed. Emp. Rel. Bd. v. Board of School, Etc.* (1976), 171 Ind.App. 79, 355 N.E.2d 269. [Footnote omitted.]"

*Id.* at 683, 377 N.E.2d at 416. *See also Indiana Civil Rights Commission v. Midwest Steel* (1983), Ind.App., 450 N.E.2d 130, 137; *Holloway v. Madison-Grant United School Corp.* (1983), Ind.App., 448 N.E.2d 27, 31, *trans. denied; Brinson v. Sheriff's Merit Bd.* (1979), 182 Ind.App. 246, 250, 395 N.E.2d 267, 270. Hence, if there was evidence in the record of the administrative proceedings to support the ICRC's findings and those findings were sufficient to support its final determination, the trial court had no option but to affirm that determination. With these basic standards established, we proceed to consider the specific challenges advanced by the DOC.

Dr. Samuelson's complaint filed with the ICRC clearly alleged gender-based employment discrimination due to the DOC's "dis-

parate treatment" of her application for the two Reformatory positions.[4] The United States Supreme Court, in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, set out a specific and detailed evidentiary procedure for resolving claims of disparate treatment.[5] That procedure provides for the shifting of the intermediate evidentiary burden of going forward. It is important to note, however, that the ultimate burden of proof never shifts. The complainant continues to bear the burden of persuading the trier of fact, by a preponderance of the evidence, that the employer intentionally discriminated against the complainant on the basis of her gender. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215; *Huck v. Whirlpool Corp.* (S.D.Ind.1982), 550 F.Supp. 968, 972. The analysis first suggested in *McDonnell Douglas* is designed to assist the litigants, trier of fact, and, we might add, reviewing court, in efficiently and fairly reaching the ultimate question raised by

these cases. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215. Hence, we turn next to a discussion of that analysis.

Initially, the complaining party has the burden of establishing a prima facie case of discrimination. *Burdine*, at 250, 101 S.Ct. at 1092, 67 L.Ed.2d at 213; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. This is not meant to be an onerous burden. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 215. Rather, the complainant is only required to show:

(1) that she belongs to a protected minority;

(2) that she applied and was qualified for the position for which the employer was seeking applicants;

(3) that, despite her qualifications, she was rejected; and,

(4) that after her rejection, the employer hired someone of complainant's qualifications.[6] *See McDonnell Douglas*, 411 U.S.

**4.** Justice Stewart, writing for the majority, succinctly distinguished the two types of discrimination in *International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, where he stated:
"'Disparate treatment' such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, *e.g., Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–266, 97 S.Ct. 555, 563–565, 50 L.Ed.2d 450. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, *e.g.,* 110 Cong.Rec. 13088 (1964) (remarks of Sen. Humphrey) ('What the bill does ... is simply to make it an illegal practice to use race as a factor in denying employment. It provides that men and women shall be employed on the basis of their qualifications, not as Catholic citizens, not as Protestant citizens, not as Jewish citizens, not as colored citizens, but as citizens of the United States').
Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be

justified by business necessity. See *infra,* at 1861. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Compare, *e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 430–432, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158, with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668. See generally B. Schlei & P. Grossman, Employment Discrimination Law 1–12 (1976); Blumrosen, Strangers in Paradise: *Griggs v. Duke Power Co.* and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972). Either theory may, of course, be applied to a particular set of facts." *Id.,* at 335–36, 97 S.Ct. at 1854–55, 52 L.Ed.2d at 415, n. 15.

**5.** Although not binding, Indiana courts have traditionally looked to federal decisions for guidance when confronted with employment discrimination issues. *See, e.g., Indiana Civil Rights Commission v. City of Muncie* (1984), Ind.App., 459 N.E.2d 411, 418, *trans. denied; Indiana Bell Telephone Co., Inc. v. Boyd* (1981), Ind.App., 421 N.E.2d 660, 665; *Indiana Civil Rights Commission v. Southerland Lumber* (1979), 182 Ind.App. 133, 140, 394 N.E.2d 949, 954, *trans. denied.*

**6.** As the court pointed out in *McDonnell Douglas,* the facts necessary to establish a prima facie case of discrimination will vary depending on

at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. Once the complainant successfully bears this initial burden and establishes her prima facie case, a mandatory inference of discriminatory motive is raised. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216; *Huck*, at 973, n. 3. The burden of going forward then shifts to the employer to rebut this inference.

The burden placed on the employer to rebut this inference of discriminatory intent is only minimal. It must merely *articulate* some legitimate, non-discriminatory reason for rejecting the complainant's application. *Board of Trustees of Keene State College v. Sweeney* (1978), 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216. The employer is not required to *prove* it was actually motivated by these reasons. Rather, it is sufficient if the employer's evidence raises a genuine issue of fact as to whether its rejection of the complainant was actually the result of discriminatory motives. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. If the employer successfully bears its burden at this stage, the inference of discriminatory intent is rebutted and the burden of going forward is once again shifted to the complainant.

■ The complainant's obligation, once the employer has articulated its legitimate and non-discriminatory reasons for rejecting her application, is to prove, by a preponderance of the evidence, that those proffered reasons are mere pretext for discrimination. *Burdine*, at 253, 93 S.Ct. at 1093, 67 L.Ed.2d at 215; *McDonnell Douglas*, 414 U.S. at 803, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. This burden may be satisfied by demonstrating either directly that the employer actually harbored discriminatory motives or indirectly by showing that the reasons advanced by the employer were, in the context of the surrounding circumstances, unworthy of credence.

*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217; *McDonnell Douglas*, 414 U.S. at 804–05, 93 S.Ct. at 1825–26, 36 L.Ed.2d at 679; *Delesstine*, at 134. Our own review of the administrative record, in light of this three-prong analysis, leads us to the conclusion that the ICRC had sufficient evidence before it from which it could conclude that the DOC intentionally discriminated against Dr. Samuelson based on her gender.

Dr. Samuelson carried her initial burden during the administrative hearing. She established her prima facie case by showing that:

(1) she was a woman;

(2) she possessed the qualifications for the Director of Education and Assistant Director of Education positions at the Reformatory;

(3) despite her qualifications, she was not offered either position; and,

(4) the DOC hired two men for the positions who possessed the same or fewer qualifications than she possessed.

Having satisfied this initial burden, the burden of going forward shifted to the DOC to articulate some legitimate, non-discriminatory reason for rejecting Dr. Samuelson's application. This it was able to do.

During the administrative hearing, the DOC was able to articulate several reasons for rejecting Dr. Samuelson. Initially, the DOC stated that it had determined that the two men who were actually appointed to the positions possessed more relevant administrative experience than Dr. Samuelson. Members of the interview committee also concluded that the two men had the appropriate attitudes and demeanors for the director's and assistant director's positions. These are clearly legitimate, non-discriminatory reasons for rejecting Dr. Samuelson's application. Therefore, the

the particular facts of each case. *McDonnell Douglas*, at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–78, n. 13. Hence, the facts Dr. Samuelson was required to prove in order to establish a prima facie case were certainly different than those Green was required to prove in *McDonnell Douglas*, a case involving racially motivated employment discrimination. For examples of how this burden has been satisfied in other contexts see *DeLesstine v. Fort Wayne State Hospital and Training Center* (7th Cir.1982), 682 F.2d 130, 134, *cert. denied* 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511; *Huck v. Whirlpool Corp.* (S.D.Ind. 1982), 550 F.Supp. 968, 973.

DOC satisfied its intermediate burden rebutting the inference of discriminatory motive. As we note above, the burden of going forward then shifted back to Dr. Samuelson.

Dr. Samuelson did present, during the administrative hearing, substantial evidence tending to establish that those reasons proffered by the DOC were merely pretext. First, she presented substantial evidence that her qualifications were equal to or exceeded those of Hipes or Fishback. In addition to the required secondary school administrator's license, Dr. Samuelson had a supervisor's license and a superintendent's license. She had also maintained a straight "A" average while earning a doctoral degree in education and secondary administration. Dr. Samuelson also had a variety of practical experience including nine years as a teacher, one year of supervisory experience, and some experience in developing curriculum, budgets and federal grant requests. During her tenure as a high school teacher, Dr. Samuelson was involved in supervision and discipline of students. In fact, she once broke-up a fight involving a knife weilding student without assistance. Finally, Dr. Samuelson had one and one half years experience as head teacher in a juvenile detention center. Substantial evidence was also introduced relevant to the qualifications of the two men ultimately appointed by the DOC. Mr. Hipes, who was appointed to the position of director, held both the administrator's license and the supervisor's license. He also had gained a great deal of administrative experience including five years as a principal and two years as an assistant principal at the high school level. However, he held only a master's degree. In addition, as the findings of the ICRC point out, he did not maintain a stellar academic record while earning that degree. Moreover, unlike Dr. Samuelson, Mr. Hipes apparently did not possess the superintendent's license. Finally, and perhaps most significantly, Mr. Hipes had no prior experience in the corrections field. Mr. Fishback, who was appointed assistant director by the DOC, held a "Specialist's" degree in school adminis-

tration. His practical experience included two years as a high school principal and one year as an assistant principal. He also had a year of experience directing federal programs for a high school. However, like Mr. Hipes, Mr. Fishback lacked any experience in corrections. From this evidence, the ICRC concluded that Dr. Samuelson was, in fact, as qualified for the Reformatory positions as either Mr. Hipes or Mr. Fishback.

Secondly, Dr. Samuelson was able to introduce evidence that the DOC had never hired a woman for a full-time position in the Reformatory's education program. A female instructor from Ball State University was recommended to teach a political science course at the Reformatory. That recommendation was rejected by the then superintendent. In fact, the BSU instructor was not allowed to teach the course until after Dr. Samuelson filed her complaint, and then only "outside the walls" in the Reformatory's Parole Room.

Finally, Dr. Samuelson introduced evidence that the DOC was predisposed to discriminate against women seeking positions at the Reformatory. She was able to introduce a statement made by Superintendent Norman Owens to the former Director of Education, Jerome Puryear, sometime prior to July 1979. Superintendent Owens purportedly told Mr. Puryear they could not employ females inside the reformatory at that time. Dr. Samuelson was also able to introduce evidence indicating that the DOC always followed Superintendent Owens' recommendations when filling openings in the Reformatory's education program.

When this evidence is considered in light of the appropriate standard of review, it is clear that the ICRC was entitled to conclude that the DOC had engaged in unlawful gender-based employment discrimination when it rejected Dr. Samuelson's application. Despite the DOC's thinly veiled request for us to do so, we will not reweigh the evidence supplanting our judgment for that exercised by the ICRC. Surely then,

the trial court did not err in refusing to accept such an invitation either.

*Issue Three*

 The DOC next argues that it had a bona fide occupational qualification (bfoq) which justifies hiring only males for the director's and assistant director's positions.[7] The burden of proof was clearly on the DOC to establish the existence of a valid bfoq defense. *Weeks v. Southern Bell Telephone & Telegraph Co.* (5th Cir. 1969), 408 F.2d 228, 232; *Fesel v. Masonic Home of Delaware, Inc.* (D.Del.1978), 447 F.Supp. 1346, 1350, *aff'd* (3d Cir.1979), 591 F.2d 1334. *See also Garrett v. Okaloosa County* (11th Cir.1984), 734 F.2d 621, 624; *Norwood*, at 1415. Since the ICRC specifically found that it had failed to sustain that burden, the DOC is in the position of appealing from a negative judgment. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 342, *trans. denied.* Therefore, that finding will be reversed only if the evidence is uncontradicted and leads unerringly to a conclusion different from that reached by the fact finder. *Id.* When this standard is applied to the record before us, we must conclude that the trial court properly affirmed this portion of the ICRC's decision.

 The bfoq defense is set out in Indiana Code section 22–9–1–3(p)(2) (Burns Supp.1985), which provides:

"It shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor orga-

nization, or joint labor management committee controlling apprenticeship or other training or retaining programs to admit or employ any other individual in any program on the basis of sex in those certain instances where sex is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."

In interpreting the identical federal provision, 42 U.S.C.S. sec. 2000e–2(e)(1) (1978), the federal courts have drawn this language in the narrowest possible terms. *See Dothard v. Rawlinson* (1977), 433 U.S. 321, 333, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786, 800. Hence, the employer must establish a factual basis for its belief that gender is a qualification reasonably necessary for the normal operation of its business. *Dothard*, at 333, 97 S.Ct. at 2729, 53 L.Ed.2d at 800; *Norwood*, at 1415; *Fesel*, at 1350. In addition, when the employer asserts the privacy rights of its customers or clients, it bears the burden of establishing that no reasonable alternative exists for accommodation of both those privacy concerns and the general non-discrimination principles of the civil rights provisions. *Norwood*, at 1415.[8] In the present case, the DOC offered two bases to justify its assertion of a bfoq defense.

Initially, the DOC argues that security concerns at the Reformatory justified the gender qualification for both positions sought by Dr. Samuelson. For this contention, the DOC relies primarily on the United States Supreme Court's opinion in *Dothard v. Rawlinson*. In that case, Rawlinson, a woman, sought employment as a "correctional counselor trainee"[9] in one of Alabama's all-male maximum-security pris-

---

**7.** Ordinarily, an employer would proceed either under the theory that it did not engage in intentional discrimination or the theory that it has a valid bfoq defense. This is due largely to the practical effect of assertion of the bfoq defense which admits the existence of discriminatory motive. *See Norwood v. Dale Maintenance System, Inc.* (N.D.Ill.1984), 590 F.Supp. 1410, 1415, n. 3.

**8.** Neither this case, nor any other cited to this court by the parties, applies this second requirement except in those situations where the em-

ployer bases his bfoq defense on privacy concerns. There appears to be no logical reason not to demand this additional showing in all cases involving assertion of the bfoq defense. However, we need not, and therefore do not, decide that issue today.

**9.** In Alabama, correctional counselors are prison guards in "contact positions" who are charged primarily with maintaining security within the institution.

ons. The court noted that these institutions had been characterized by "rampant violence" and a "jungle atmosphere." *Dothard*, 433 U.S. at 334, 97 S.Ct. at 2729, 53 L.Ed.2d at 800. These characterizations, together with evidence that the mere presence of female guards in an all-male Alabama prison would seriously endanger security at those institutions, led the court to conclude that there was a valid bfoq defense. *Dothard*, at 336, 97 S.Ct. at 2730, 53 L.Ed.2d at 802. However, the court also seemed to indicate that this was a unique situation when it stated:

"Alabama's penitentiaries are evidently not typical. Appellee Rawlinson's two experts testified that in a normal, relatively stable maximum-security prison— characterized by control over the inmates, reasonable living conditions, and segregation of dangerous offenders— women guards could be used effectively and beneficially. Similarly, an *amicus* brief filed by the State of California attests to that State's success in using women guards in all-male penitentiaries."

*Dothard*, at 336, 97 S.Ct. at 2730, 53 L.Ed.2d at 801, n. 23.

■ The DOC argues that the Reformatory is much like the Alabama prisons which were the subject of *Dothard*. It points out that the Reformatory is home to a large number of unsegregated sex offenders. Moreover, it introduced evidence that the staff was occasionally assaulted by inmates. Finally, the DOC refers us to two federal district court cases, *French v. Owens* (S.D.Ind.1982), 538 F.Supp. 910, and *Hendrix v. Faulkner* (N.D.Ind.1981), 525 F.Supp. 435, *aff'd in part rev'd in part sub nom Wellman v. Faulkner* (7th Cir. 1983), 715 F.2d 269, finding general conditions in both the Reformatory and the State Prison at Michigan City violative of the Eighth Amendment. The DOC has ignored, however, the contradictory evidence supporting the ICRC's findings. This included evidence that no Reformatory education staff member had ever been assaulted by an inmate. Additionally, evidence was introduced showing that women had

been employed in positions "inside the walls" at both the State Prison and Reformatory in the past without incident. Finally, the ICRC found that most discipline problems at the Reformatory occur at times when the education staff would not be present. Based upon this conflicting evidence, the ICRC specifically found that *Dothard v. Rawlinson* did not control. In view of the DOC's burden on appeal, the trial court was not in a position to ignore the ICRC's conclusion that the DOC had failed to establish a basis in fact for applying a bfoq based on security concerns.

The DOC, however, also asserted the privacy rights of the inmates at the Reformatory as a basis for a valid bfoq defense. While prisoners certainly enjoy fewer privacy rights than an unincarcerated person, they do retain some basic privacy rights. *Cumbey v. Meachum* (10th Cir.1982), 684 F.2d 712, 714. Among those privacy rights retained by prisoners is the right not to have certain parts of their bodies exposed to members of the opposite sex. *Cumbey*, at 714; *Lee v. Downs* (4th Cir.1981), 641 F.2d 1117, 1119. It is undisputed that in the course of both the director's and assistant director's normal daily duties they would be able to observe the inmates using the Reformatory's open toilet facilities. Consequently, the DOC clearly established a factual basis for a bfoq based on prisoner's privacy rights. We turn then to a discussion of the second required showing.

As we discussed above, when privacy rights are the asserted basis for the claimed bfoq, the employer bears the additional burden of establishing that no reasonable alternatives exist which would permit protection of the asserted privacy rights while also allowing the hiring of the complainant. In this case, the DOC failed to make any such showing. The ICRC in fact specifically found that a partition or wall could be placed in front of education building toilets which would protect the inmates privacy interests without significantly impinging on the Reformatory's security concerns. Consequently, the ICRC was also entitled to conclude that the DOC

had failed to establish a valid bfoq based on the inmates' privacy rights.

*Issue Four*

Finally, the DOC argues that the trial court erred when it failed to reverse the specific remedy ordered by the ICRC. That order stated:

"1. The Reformatory shall cease and desist from not hiring females for, among other reasons, reasons due to the architecture of the school building. To this end, the Refmoratory shall consider the proposed modifications suggested in Finding of Fact No. 42; shall consider the relevant qualifications of female applicants for the positions; and shall hire individuals without regard to sex.

2. The Reformatory shall offer Samuelson the director of education position within one (1) week following the next time it becomes vacant. She shall have one (1) week to respond to and accept this offer and if she fails to do so within one (1) week of acknowledged receipt of the offer, the Department shall be free to revoke the offer." [10]

Record at 61. The DOC reasons that the ICRC exceeded its statutorily delegated authority in issuing this order in at least two respects.

The DOC first asserts that the ICRC does not have the authority to order it to modify the Reformatory's physical plant or even to consider such modifications. Clearly, the challenged order does not require the DOC to make any changes in its inmate toilets. We need not determine, consequently, whether the ICRC had the authority to require such modifications. Furthermore, we are aware of no legal principle, and the DOC has shown us none, which would prevent the ICRC from ordering a party properly before it to *consider* making some change in its physical plant.

The first part of the ICRC's final order was, therefore, valid.

Secondly, the DOC argues that the ICRC does not have the authority to require it to offer Dr. Samuelson the director's position when the next vacancy occurs. This issue was essentially resolved, however, in *Indiana Civil Rights Commission v. Midwest Steel* (1983), Ind. App., 450 N.E.2d 130. In that case, four of the employer's male employees who had failed a crane operator's exam were given additional training. Upon retesting, all passed. In contrast, complainant, a woman who also failed the crane operator's exam, was not offered any additional training. She was forced to return to her position as a laborer for the employer. Based upon these facts, this court upheld that portion of the ICRC's order which required Midwest Steel to immediately offer the complainant a crane operator's position with seniority rights from the date she should have been given the position originally. *Midwest Steel,* at 141. Judge Garrard, writing for the third district in *Midwest Steel,* concluded that when the statutorily delegated powers of the ICRC were examined, particularly in light of the demands of Indiana Code section 22-9-1-2(e) (Burns Supp.1985), which requires the civil rights act to be construed broadly to effectuate its purposes, the remedy of reinstatement was not precluded.[11] Although the opinion characterizes the challenged order as one requiring reinstatement, we view it as more akin to the situation with which we are presented here because the complainant in Midwest Steel had never been a crane operator. Consequently, we are compelled to agree with the trial court's conclusion that the ICRC's order did not exceed its authority.

---

10. The modifications suggested in Finding of Fact No. 42 included: "constructing undoored walls around inmate toilets in the schools provided that the walls extend no higher than the height of the average male torso and provided that the walls be open at the bottom to the extent that they would reveal to view the lower leg and feet of someone using the toilets." Record at 55.

11. The ICRC's remedial powers are set out in Indiana Code section 22-9-1-6(k)(1) (Burns Supp.1985).

The judgment of the trial court is affirmed.

NEAL, J. and ROBERTSON, J., concur.